**UNITED STATES of America,**
Appellee,

v.

**SHEBA BRACELETS, Inc., and Robert J. Carroll, Defendants-Appellants.**

**No. 293, Docket 24419.**

United States Court of Appeals Second Circuit.

Argued May 14, 1957.

Decided Aug. 14, 1957.

Writ of Certiorari Denied Dec. 16, 1957.

See 78 S.Ct. 330.

Palmer, Masia & Palmer, New York City, Samuel Masia and Henry H. Zolki, New York City, of counsel, for appellants.

Paul W. Williams, U. S. Atty., New York City, Robert Kirtland, New York City, and Robert K. Ruskin, New Rochelle, Asst. U. S. Attys., of counsel, for appellee.

Before CLARK, Chief Judge, and SWAN and POPE, Circuit Judges.

POPE, Circuit Judge.

The appellants, Sheba Bracelets, Inc., a New York corporation, and Robert J. Carroll, its treasurer, were convicted upon four counts of an indictment under Title 18, § 1001, U.S.C.[1] In these counts

1. "§ 1001. Statements or entries generally—Whoever, in any matter within the jurisdiction of any department or agency of the United States knowingly and willfully falsifies, conceals or covers up by any trick, scheme, or device a material fact, or makes any false, fictitious or fraudulent statements or representations, or makes or uses any false writing or document knowing the same to contain

the two defendants were charged with knowingly and wilfully making false, fictitious and fraudulent statements and representations in an "End-Use Certificate for Semi-Processed Gold." The false statements were charged to have been made in two certificates of that character on the 14th and 28th of September, 1951. The statements charged to have been false were (a) that the defendant Sheba was regularly engaged in the industry of manufacturing jewelry which required the use of gold; and (b) that certain gold which was sold to Sheba would be used by it in the industry in which it was regularly engaged.[2]

Sheba held a license issued to it under an executive order made pursuant to Title 12 U.S.C.A. § 95a which authorized it to acquire gold for use in the jewelry manufacturing industry.[3] On the dates mentioned in the indictment, Carroll, for the corporation, delivered to a firm of gold refiners these end use certificates for the purpose of procuring the quantities of gold which Sheba was permitted to purchase under its license. The Government's evidence was that contrary to the representations made in the certificates, Sheba was not engaged in the manufacture of jewelry and the gold purchased was not intended to be used for such purpose, and was in fact disposed of otherwise.

One group of errors assigned by appellants relate to the court's denial of motions to suppress evidence alleged to have been obtained by the Government by unlawful means. Most of the other claims of error arise out of the court's refusal to require the prosecution to furnish the defendants certain written reports made at the time by Government Secret Service agents concerning events and activities testified to by them at the trial.

Insofar as it has any substance, the argument relating to the motion to suppress grows out of the circumstance that the Government produced evidence tending to prove that one Frank Brooks, who, according to Sheba's books, purchased its entire output of gold bracelets from March, 1951, on, was non-existent, —that there was no such person. This was a substantial part of the evidence which the Government adduced to show that Sheba manufactured no jewelry and had no customers for bracelets. The argument is that if the evidence which appellants say was illegally secured had been suppressed by the court, the Government could not have relied upon this proof as to the non-existence of Frank Brooks. They say that only through illegally obtained evidence did the prosecution procure the investigative lead or clue as to Frank Brooks; that the knowledge that the sole customer was supposedly one Frank Brooks was "knowledge gained by the Government's own wrong,"[4] and hence this proof could not be used at all

The manner in which the Government procured the evidence on which it relied for conviction was as follows: On July 25, 1951, Treasury agents went to the premises where Sheba purported to be manufacturing jewelry for the purpose of inspecting its books. Such inspection was authorized by the terms of the

---

any false, fictitious or fraudulent statement or entry, shall be fined not more than $10,000 or imprisoned not more than five years, or both."

2. The case was tried upon these four counts, upon which the defendants were convicted, and also upon a count charging conspiracy to violate Title 12, § 95a, U.S.C.A. providing for an embargo on bullion and gold and regulating transactions in gold or silver coin or bullion. The conspiracy count was dismissed at the conclusion of the Government's case.

3. Executive Order No. 6260, which appears as a footnote to this section (12 U.S.C.A.), provides that "No person other than a Federal Reserve bank shall after the date of this order acquire in the United States any gold coin, gold bullion, or gold certificates except under license therefor issued pursuant to this Executive order." .

4. Silverthorne Lumber Co. v. United States, 251 U.S. 385, 392, 40 S.Ct. 182, 183, 64 L.Ed. 319.

license.[5] Carroll was absent when the agents arrived. They waited for him and when he telephoned they talked to him explaining they were there to inspect the premises and examine the books. He stated he had no objection, but that his employees there present (employees of Carroll Instrument Co., a different concern of his), did not have sufficient knowledge of the books. He then made an appointment to meet the agents later in the day at the United States Assay office. At that time and place he was given a list of the books and records required, and two days later these were sent by Carroll to the agents by messenger. The agents kept them for a week returning them on August 3. Included was the Cash Receipts Book, the same book which was subsequently received in evidence at the trial as Exhibit 18. This was the book which recorded the sales of gold bracelets to Frank Brooks. It was while the agents were waiting for Carroll at the Sheba place of business that they noticed that although there was jewelry manufacturing machinery there it was not set up for use, apparently merely stored there, and covered with dust.

Between April 2 and September 13, 1951, Carroll for Sheba purchased from Kastenhuber & Lehrfeld, New York gold refiners, 15,000 ounces of gold, valued at $534,000. These were acquired in separate purchases of approximately 150 ounces each, and on each occasion an end use certificate executed on behalf of Sheba, was delivered to the refiners. Carroll's procedure, in making these purchases, followed a fixed pattern. He would meet a Louis Fisher at a bank, where Fisher would hand him a sum of cash. He would then get a certified check from the bank and with that pay for the gold. The 150 ounces, usually in three bars, would be wrapped in brown wrapping paper when delivered to Carroll.

In September, 1951, Treasury agent Newbrand began following Carroll after he made these purchases. On seventeen different days during that month Carroll would emerge from Kastenhuber & Lehrfeld carrying the package wrapped in brown paper and would go to a building at 10 West 47th Street in Manhattan in which was located the office of Mr. and Mrs. S. Diamant. (Mrs. Diamant was a cousin of Louis Fisher, who delivered the cash to Carroll.) On each occasion Carroll would emerge from the building five or ten minutes after he had entered, and without the package of gold. On September 28, the last of these seventeen days, Agent Newbrand followed him upstairs in the building and saw him enter the Diamant office. When he came out without the package, Carroll was placed under arrest by the agent. Within a half hour another agent arrived with a search warrant for the Diamant office, but upon search no gold was found there. There was then no warrant for Carroll's arrest, and as we shall hereafter note, defendants made much ado about this arrest without a warrant. A reading of the record gives the impression that the defense was contending that because the arrest was an illegal one, the consequence was not merely that evidence taken as an incident to that arrest would be subject to a motion to suppress, but

---

5. In its original application for a gold license Sheba agreed that it "will keep exact records of all his acquisitions and deliveries of gold" and to "make such records available for examination by a representative of the Treasury Department at any time." Its license required it to "Keep all records prescribed under § 54.26 of the Gold Regulations." That section (Code of Federal Regulations, 1949 Ed. Title 31, Part 54, § 54.26) provided: "Records. Every person holding a license issued pursuant to § 54.23 shall keep exact records of all his acquisitions and deliveries of gold. His records shall contain the name, address, and license number of each person from whom he acquires, or to whom he delivers, gold (other than fabricated gold) and shall show the amount, date, and description of each such acquisition and delivery, and such records shall be available for examination by a representative of the Treasury Department for at least 1 year after the date of the disposition of such gold."

that its effect was to give the defendants an immunity from prosecution.

At the time of the arrest a felony had been committed and there was reasonable cause for believing that Carroll had committed it (Cf. United States v. Perez, 2 Cir., 242 F.2d 867, 869). The officer had authority to make such arrests.[6] While the arrest would appear to have been a lawful one, yet nothing turns upon whether it was or not, for it does not appear what if anything was taken from Carroll at the time of his arrest, and nothing so taken was offered or received in evidence against the defendants. Hence the circumstances of the arrest could not be an occasion for an effort to suppress evidence.

In the afternoon of the day of Carroll's arrest, Newbrand with another Treasury agent went to Sheba's place of business in Brooklyn. They had no warrant to search those premises, which were in the main occupied by Carroll Instrument Co. The foreman of the latter company gave them permission to look around the premises. They made an inventory of the gold manufacturing machinery, which was stored in the rear of the place, and they took with them three sales invoice tablets, several Post Office Department return receipt cards, several cancelled checks, and a sheet listing names of Brazilian companies.

Appellants undertake to characterize this occurrence as an illegal search and seizure, and say that knowledge of Frank

Brooks "came from the books and records illegally seized on September 28, 1951, the date of the arrest of the defendant Carroll." There is no proof to support that assertion, and the fair inferences from the record are all to the contrary. It nowhere appears that on that occasion either of the agents examined the books, or more particularly, the Cash Receipts Book, where the Frank Brooks name appeared.[7] So far as that book was concerned, there is no showing that there was any search of it on that occasion, nor of any other record referring to Frank Brooks, and definitely there was no seizure of it, for it remained in defendants' possession. As for the tablets, the return receipt cards, the checks and the list of Brazilian companies they did take, none of them were offered in evidence.

The Cash Receipts Book, with its entries re Frank Brooks remained in Sheba's possession until April, 1954. At that time a revenue agent of the Internal Revenue Service was making an income tax examination of Sheba for the years 1948 through 1951, and Carroll was requested to furnish Sheba's records for the agent's use in connection with that examination. Carroll complied, and delivered the books and records, including the Cash Receipts Book, to the office of the District Director at Brooklyn. Carroll's affidavit in support of his motion to suppress these books as evidence stated that the Internal Revenue agent had

---

6. Title 18 U.S.C. § 3056 authorizes Secret Service officers to "detect and arrest any person committing any offense against the laws of the United States relating to coins, obligations, and securities of the United States and of foreign governments." The falsified end-use certificates were a part of the Government's system of regulation of bullion and coin provided for in Title 12, § 95a.

7. The court was warranted in inferring that counsel for defendants carefully avoided any inquiry as to whether the agents examined the books on that occasion. Counsel cross-examined agent Newbrand as follows:

"Q. When you were in the place on September 28th, before you left, did you see any books and records there of the Sheba? A. Yes, I believe I did.

"Q. Afterwards did you see those books and records in 90 Church Street or anywheres else, or in the District Attorney's office? A. Yes, I saw them in the United States Attorney's office.

"Q. When? A. In June.

"Q. In June? A. 1956.

"Q. Did you see them before that time? A. No, I don't believe so."

The trial court later remarked to defense counsel that this appeared to be "adroit" questioning: "Then you left it and dropped it very quickly at that point."

promised to return the books within a short time.

The books were not returned, and in May, 1956, the examining agents turned them over to the United States Attorney at his request. It was thus that the prosecution gained access to the books and had them available for introduction at the trial which opened on September 11, 1956, some four months later.

When the United States Attorney received those books, § 7213(a) of the 1954 Revenue Code, 26 U.S.C. § 7213(a) made it unlawful for any officer or employee of the United States to permit any book containing particulars of income returned by a taxpayer to be seen or examined by any person except as provided by law. § 1905 of Title 18 U.S.C. prohibits any officer or employee of the United States to divulge, disclose or make known in any manner or to any extent not authorized by law any information coming to him by reason of any examination or investigation made by such officer or employee where that information concerns the amount or source of income of any corporation.[8] Appellant argues that it was unlawful for the revenue agents to furnish these books to the United States Attorney for use by him in a criminal prosecution, particularly for an offense having nothing to do with taxes.

Appellant contends that such an unauthorized delivery of these books to the prosecuting officers was tantamount to an unlawful and unreasonable search or seizure; that in law it amounted to the same thing, and that therefore appellants were entitled to have these books suppressed as evidence and returned to them; that they were improperly received in evidence, and the prosecution was improperly permitted to use the fruits of their unlawful acquisition in turning up the evidence with respect to Frank Brooks.[9]

■ Of course Sheba, though a corporation, was entitled to claim the protection of the Fourth Amendment. Silverthorne Lumber Co. v. United States, 251 U.S. 385, 40 S.Ct. 182, 64 L.Ed. 319. But we find it unnecessary to pass upon the validity of this contention of appellants. Even if it be assumed that the delivery of these books to the United States Attorney was contrary to law, and that his obtaining them was tantamount to an unlawful search and sei-

---

8. § 1905 Title 18 U.S.C.: "Disclosure of confidential information generally—Whoever, being an officer or employee of the United States * * * publishes, divulges, discloses, or makes known in any manner or to any extent not authorized by law any information coming to him in the course of his employment or official duties or by reason of any examination or investigation made by, or return, report or record made to or filed with, such department or agency or officer or employee thereof, which information concerns or relates to the * * * identity, confidential statistical data, amount or source of any income, * * * of any person, firm, partnership, corporation, or association; or permits any income return or copy thereof or any book containing any abstract or particulars thereof to be seen or examined by any person except as provided by law; shall be fined not more than $1,000, or imprisoned not more than one year, or both; and shall be removed from office or employment."

9. Appellants' theory with respect to this is best stated in an affidavit filed by Carroll in support of the motion to suppress as follows: "Deponent is also informed by his attorney that under the authorities above cited the documents seized by the Government must be returned to deponent, or at least that those documents cannot be admitted in evidence. In this connection deponent is informed by his attorney that it is entirely immaterial whether the documents in question were taken by the Government by force or whether some of those documents were turned over by deponent to the Agent of the Internal Revenue Bureau after his arrest when they stated that they were making an investigation of deponent's books for tax purposes. Deponent is informed by his attorney that any such turning over of said books and records cannot be considered as voluntary since anything done by deponent after his arrest must be presumed to have been done under compulsion."

zure,[10] appellants waived any right they may have had to move for their return by their failure to make timely application to suppress them.

All of the facts relating to Carroll's arrest, to the Treasury agents' visit to Sheba's premises on September 28, 1951, and the fact that Sheba's books which had been delivered to the Director of Internal Revenue had come into the hands of the United States Attorney, were known to Sheba and Carroll long before the case came to trial. Yet it was not until after the Government's case in chief had been concluded and some evidence had been offered on behalf of defendants that defendants' motion to suppress was presented to the trial court.

The trial was begun on Tuesday, September 11. At the end of the day on Thursday, September 13, the court excused the jury until the following Monday to meet the convenience of persons in attendance at the trial who desired to commence the celebration of the Jewish holiday at the end of the following day. Counsel were required to attend the following morning, September 14, and it was at that time that defendants moved to dismiss sundry counts in the indictment and undertook to argue the question of the legality of Carroll's arrest, of the alleged search and seizure of Sheba's premises on September 28, 1951, and of

the process by which the United States Attorney procured Sheba's books from the revenue agents. The motion to suppress, supported by affidavits, was presented on the following Tuesday, September 18.

The court held that there had been a waiver of any constitutional right defendants may have had by their failure to move to suppress the evidence in advance of the trial; and found that not only defendants, but their counsel, also, knew about all these circumstances months prior to the trial. The court said: "Since I believe that it would not further substantial justice to allow a motion to suppress this evidence in the midst of the trial I deny this part of the motion."

The showing made on the motion to suppress was such as to compel the court's finding that defendants were aware of all the circumstances relating to the alleged improper procuring of evidence long before the case came to trial. Thus Carroll in his affidavit in support of the motion to suppress stated that about six months after his arrest an Internal Revenue agent asked to check the records of Sheba for tax purposes and examined the records on the premises; that the agent asked Carroll for other books and records, apparently missing, and Carroll informed him "that

---

10. We assume that the argument sought to be made with respect to the use by the prosecution of books which had been voluntarily delivered to the Revenue Agents solely for an income tax investigation is based upon the reasoning that if the Government can first require a person to produce his books for an income tax investigation pursuant to the requirements of the Internal Revenue Code (§ 3614 of the 1939 Code, 26 U.S. C. § 3614 and § 7602 of the 1954 Code, 26 U.S.C. § 7602), and then search through them and ferret out evidence to be used in the prosecution of offenses not related to taxes, then there has been a substantial denial of such persons' Fourth Amendment right "to be secure in their persons, houses, papers, and effects." United States v. Guerrina, D.C. E.D.Pa., 112 F.Supp. 126, appears to be the only case tending to support that

contention. The order suppressing evidence in that case was subsequently withdrawn upon a reconsideration of the case. United States v. Guerrina, D.C., 126 F.Supp. 609. United States v. Wolrich, D.C.S.D.N.Y., 129 F.Supp. 528, differs from this case in that the court there, upon hearing of a motion to suppress, agreed to hear evidence on the question whether the taxpayer's books and papers were obtained by the tax officials through fraudulent misrepresentations as to the purpose of the investigation. Some general references to the question have been made in Scanlon v. United States, 1 Cir., 223 F.2d 382, 384, and in Boren v. Tucker, 9 Cir., 239 F.2d 767. In both cases the proposed use of the evidence supplied to the Revenue Agents was in the prosecution of crimes defined by the Internal Revenue Code.

the Secret Service agents had searched the premises and were seen to have removed certain records." After reciting that he later allowed another Internal Revenue agent to have his books for a tax investigation said to have nothing to do with the indictment, Carroll continued that in spite of the agent's promise to return the books, deponent "never saw those books again until June of 1956, when he visited the office of the United States Attorney in charge of the case. It was then for the first time that deponent learned that the Internal Revenue Department had turned over the books which were given to them in connection with the alleged tax investigation to the United States Attorney's office for the purpose of the instant proceeding."

The court was satisfied that defendant's counsel also visited the United States Attorney's office about the same time, and saw the books there. Not only did that appear from the affidavit of the Assistant United States Attorney, but in his opening statement to the jury counsel for the defendants said that he had seen Sheba's books in the office of the Assistant United States Attorney "when they called us down to their office." Counsel had entered his appearance for the defendants on June 15, 1956, and at that time made a statement to the court complaining about Carroll having been arrested without a warrant and asking that there be returned various papers then taken from Carroll.[11]

The court was also justified in disbelieving as wholly incredible the assertion of the defendants that it was not until during the trial that they learned for the first time that Carroll's arrest and the search were made by the Government without warrants. In any event, as stated by this court in United States v. Chieppa, 2 Cir., 241 F.2d 635, 638, "If they were unaware of the lack of a warrant, they could have easily acquired that information far in advance of the trial."

■ Actually what transpired when the agents went to Sheba's premises on September 28, 1951, is irrelevant here in view of the fact that the Cash Receipts Book with its entries relating to Frank Brooks came into the hands of the United States Attorney in May, 1956, and thus the information and knowledge as to Frank Brooks was available from a source wholly independent of anything that may have transpired on September 28, 1951. If we were to assume that the agents improperly obtained knowledge about Frank Brooks on September 28, 1951, that would not mean that the Government could not use information about Frank Brooks which it later obtained from another source. Facts improperly obtained do not become secret and unaccessible. If knowledge of them is gained from an independent source they may be proven like any others. Cf. Nardone v. United States, 308 U.S. 338, 60 S.Ct. 266, 84 L.Ed. 307, quoting from Silverthorne Lumber Co. v. United States, su-

11. It is not difficult to understand why the court accepted the Government's assertion that defendants were fully advised as to the circumstances relating to the Government's procuring of books long before the date of the trial. Thus the following colloquy occurred between the court and counsel for the defendants:

"The Court: Just one last question. Do you admit having told Mr. Ruskin, in substance, in June that you were concerned about the legality of the arrest and the seizure of papers from the person of Mr. Carroll and that you wanted an inventory of what they seized?

"Mr. Palmer: I have no recollection, honestly, of a conversation of that kind. I know we were in there kidding with each other, because I wanted my client to get hold of the records, which finally turned up in their office, but I have no recollection of any particular conversation along that line, because I never knew he wasn't arrested legally.

"The Court: I have a feeling that you may very well have waived whatever rights you have by not making a timely motion.

"Mr. Palmer: I am sorry, I wasn't in the case.

"The Court: But you don't deny making the statement; you don't recall it, but you don't deny it."

pra. The important single fact here is that knowledge of the purported dealings with Frank Brooks came into the hands of the United States Attorney when he received the books from the Revenue Service. This was known to the defendants in June, 1956, substantially three months prior to the date of the trial.

It has long been the rule, certainly ever since the decision in the Weeks case (Weeks v. United States, 232 U.S. 383, 34 S.Ct. 341, 58 L.Ed. 652), that a defendant desirous of taking advantage of his right to object to the use of evidence obtained illegally or in violation of his rights under the Fourth Amendment must move to suppress and have the books or evidence returned to him in advance of the trial unless the circumstances are such that he is without the necessary knowledge or opportunity to do so. This rule has now been incorporated in the last sentence of Criminal Rule 41(e), 18 U.S.C.,[12] but it is merely a restatement of the law as it was previously. United States v. Di Re, 2 Cir., 159 F.2d 818, 820.

The manner in which the United States Attorney obtained the books from the Income Tax Bureau did not literally constitute a "search and seizure" of the sort described in Rule 41. But the same reasons which gave rise to the original rule that a motion to suppress evidence must ordinarily be made before trial, would clearly operate here to require us to sustain the trial court in exercising its discretion to refuse to suppress the books obtained from the Internal Revenue Service on the ground that the motion was not timely made. Those reasons were stated in Segurola v. United States, 275 U.S. 106, 111, 48 S.Ct. 77, 79, 72 L.Ed. 186, as follows: "This principle is that, except where there has been no opportunity to present the matter in advance of trial, * * * a court, when engaged in trying a criminal case, will not take notice of the manner in which witnesses have possessed themselves of papers or other articles of personal property, which are material and properly offered in evidence, because the court will not in trying a criminal cause permit a collateral issue to be raised as to the source of competent evidence. To pursue it would be to halt in the orderly progress of a cause and consider incidentally a question which has happened to cross the path of such litigation and which is wholly independent of it." In Nardone v. United States, supra, dealing with evidence claimed to have been obtained as a result of unlawful wire tapping, the court said (308 U.S. at page 341, 60 S.Ct. at page 268): "Dispatch in the trial of criminal causes is essential in bringing crime to book. Therefore, timely steps must be taken to secure judicial determination of claims of illegality on the part of agents of the Government in obtaining testimony. To interrupt the course of the trial for such auxiliary inquiries impedes the momentum of the main proceeding and breaks the continuity of the jury's attention * * * And if such a claim is made after the trial is under way, the judge must likewise be satisfied that the accused could not at an earlier stage have had adequate knowledge to make his claim."

In United States v. Salli, 2 Cir., 115 F.2d 292, 293, this court, citing both the Segurola and the Nardone cases, in upholding the trial court's refusal to entertain motions to suppress evidence alleged to have been obtained through unlawful search and seizure, said: "But the defendants may not raise the question here because they waited until the trial came on—four months after the indictment was found—before they raised it * * * There is every reason why [the Supreme Court should express the views as in the Nardone case] when the facts are all available in season; nothing is more unfair than to leave open a preliminary inquiry which will make the

12. "The motion shall be made before trial or hearing unless opportunity therefor did not exist or the defendant was not aware of the grounds for the motion, but the court in its discretion may entertain the motion at the trial or hearing."

whole prosecution abortive, and thus to put the authorities and their witnesses to the trouble and expense of useless preparation." Similar views have been expressed by this court in United States v. Sansone, 2 Cir., 231 F.2d 887; United States v. Chieppa, supra; and United States v. Allied Stevedoring Corp., 2 Cir., 241 F.2d 925.

■ We hold that the trial judge had a similar discretion to refuse to suppress the books of Sheba received from the Internal Revenue Service and the evidence resulting therefrom because whatever right Sheba might otherwise have had to object to the manner in which the books were obtained, was waived through its failure to move to suppress until midway in the trial of the case.

The Government has argued that since Sheba had applied for a license, and thus agreed to regulations which required it to keep records which are to be "available for examination by a representative of the Treasury Department," it must be deemed to have consented to the use that the Government officials made of its books, and to have waived its claim to privacy under the rule of Zap v. United States, 328 U.S. 624, 628, 66 S.Ct. 1277, 1279, 90 L.Ed. 1477. Whether the waiver was found in the Zap case only because the inspection "was made during regular hours at the place of business," and whether the facts of this case would require a different conclusion need not be considered by us, for, as we have seen, failure to move to suppress the evidence before the trial is fatal to appellants' position in any event.

This brings us to the second group of contentions made by the appellants,— those relating to the refusal of the court to require the prosecution to furnish certain written reports of the Secret Service agents to the defendants.[13] The first set of Secret Service reports requested had nothing to do with the testimony of any witness at the trial, nor were they sought by defendants for use in examining or cross-examining any witness. In fact, the privilege of examining them was not requested by the defendants at all. What happened was that during the trial when counsel for the defendants was asserting that the Government had learned about Frank Brooks by a search of Sheba's premises on September 28, 1951, the prosecutor made the statement that the Government had obtained knowledge of Frank Brooks and was actually making investigations concerning him prior to that date and in consequence of information obtained through the inspection of Sheba's books in July, 1951, when Carroll sent them by messenger to the Assay office.

■ After this statement had been made by the United States Attorney, defendants' counsel asked the court to examine those reports for itself for the purpose of checking the accuracy of this assertion. The court agreed to do so and the reports were handed to the court by the Government. Thereupon the following colloquy occurred between defendants' counsel and the court:

"Mr. Palmer: Will they be marked as a Court exhibit?

"The Court: I will put them in a sealed envelope and they will be marked as a Court exhibit in a sealed envelope.

"Mr. Palmer: Very good.

"The Court: And will not be subject to your scrutiny, but they will be available for the scrutiny of the appellate court, if the appellate court is so advised.

"Mr. Palmer: All right."

No further request was made in respect to those reports. It is plain that their examination by the court *in camera* and without showing them to counsel for the defendants could under no circumstances constitute prejudicial error since, for the reasons here previously indicated,

13. The complaint respecting the refusal to furnish defendants these reports was not made until after the case had been argued and submitted. After the decision in Jencks v. United States, 77 S.Ct. 1007, appellants applied for and were granted leave to file a supplemental brief for the purpose of urging that the rule of the Jencks case required a reversal here.

it was of no consequence whether the Government did or did not know about Frank Brooks through the July examination. It is plain that full knowledge of him and of the entries in the books concerning him came to the United States Attorney in May, 1956, in a manner concerning which the appellants cannot now complain. Nothing in the Jencks case supports any claim of error in respect to these reports.

The next ruling concerning Secret Service reports of which appellants complain, had to do with the refusal of the court to call for and examine the report of Secret Service Agent Sweeney. Agent Sweeney was called as a witness by the defense which procured from him the testimony that when Carroll was arrested on September 28, 1951, the agents did not have a warrant for his arrest. On cross-examination Government counsel elicited from the witness testimony that he also had observed Carroll going into the Diamant building on September 17 or 18, 1951, carrying a package which he had left behind him when he came out a few minutes later. There was no further examination of Sweeney by the defendants and the witness was excused. The defense proceeded to call other witnesses. Both sides rested and the testimony was closed. This was on Friday afternoon, September 21, 1956, and the court adjourned until the following Monday morning, at which time arguments to the jury were to begin. On Monday morning, as the jury were waiting to hear summations, counsel for the defendants made the following request: "Another thing, if your Honor please. Will you be good enough to scrutinize the report by Mr. Sweeney, as to whether or not on the 17th or 18th of September he actually went into the premises of 47th Street and saw Mr. Carroll go inside with the package and come out without the package?" This the court declined.

 It is plain that there was no error here. Not only had witness Sweeney been excused and the taking of testimony closed, but there was no suggestion on the part of the defendants that Swee-

ney's reports were sought for the purpose of aiding in any examination of Sweeney. Presumably Sweeney had left the courthouse, and there was no showing that he would have been available even if the court had been willing to reopen the case and order him recalled. "Whether a case may be reopened for further evidence rests in the sound discretion of the trial court and it will not be interfered with unless clearly abused." People v. Siciliano, 4 Ill.2d 581, 123 N.E. 2d 725, 731. See, in accord, State v. Shea, 77 R.I. 373, 75 A.2d 294, 296; State v. Massey, 358 Mo. 1108, 219 S.W. 2d 326, 332. United States v. Bayer, 331 U.S. 532, 537–539, 67 S.Ct. 1394, 91 L.Ed. 1654, is, we think, an application of the same rule. Under the circumstances here there was no showing of an abuse of the court's discretion in rejecting the demand for the Sweeney reports. Nothing in the Jencks decision, supra, lends any support to the appellants' position on this.

During the cross-examination of agent Newbrand, counsel for defendants inquired whether he found a foot press at Sheba's premises. When the witness stated he did not recall, he was asked whether his notes would show; he replied that they would, and he was asked to look at them. He said he did not have the notes. He was requested to produce them and was so directed by the court. He produced his handwritten notes of what he did on September 28, 1951, the day on which he made the list of machines inquired about. The notes were marked as an exhibit and turned over to defendants' counsel. Counsel then inquired about reports of Newbrand's surveillance of Carroll on days prior to September 28, and was informed by the witness that these were all typewritten formal reports. He asked that they be produced; they were produced and scrutinized by the court which marked them as court's exhibits. Among the formal reports thus produced was one of September 28, 1951, verbatim the same as the handwritten notes for that date which had been furnished to the defend-

ants' counsel. From this formal report of this date, the court furnished defendants' counsel the page listing the equipment found at Sheba's premises on that date, but the remainder of the formal reports which referred to the surveillance of Carroll on September 5, 6, 10, 11, 12, 13, 14, 17, 18, 19, 20, 21, 25, 26 and 27, although examined by the court, were not handed to counsel for the defense as he requested.

The Government concedes that under the decision in the Jencks case, supra, these reports should have been turned over to the defense, but asserts that the failure of the court to do so was not prejudicial and should be considered harmless error within the meaning of Rule 52(a) of the Rules of Criminal Procedure.[14]

True enough if these reports of Agent Newbrand had been furnished to defense counsel he might have used them in connection with his cross-examination of this witness. These particular typewritten reports were marked as "Court's Exhibit 6 for Identification" and are part of the record before this court. The description in them of Newbrand's surveillance of Carroll on his trips with the gold from the refiners to the premises occupied by the Diamants, is in every particular the same as set forth in the handwritten notes of the September 28 surveillance. It will be recalled that the testimony was that on each of those seventeen days Carroll went through precisely the same movements in the delivery of the gold. It is difficult to see that the use of these reports on cross-examination would have accomplished anything other than a demonstration that Newbrand had written in his reports the same thing to which he testified at the trial.

██ But it is abundantly clear that any error in refusing to hand them to defense counsel was a harmless one which cannot, under any circumstances, have affected the substantial rights of the defendants. This is so because the evidence of the guilt of the defendants was simply overwhelming. In the six months period April through September, 1951, Carroll on 94 different days purchased approximately 150 ounces of fine gold from the refiners. This was established by the production of 94 end-use certificates, including the two described in the indictment, from the records in the office of Kastenhuber & Lehrfeld. The certified checks which paid for the gold were produced and the gold that Carroll and Sheba acquired during that period amounted to approximately 15,000 ounces at a total cost of $534,000. As before indicated, on the 17 days in September on which Carroll was followed, the gold was left in the building occupied by the Diamants, and on the final day, September 28, it was observed to have been left in Diamant's office. That on search, 30 minutes later, no gold was found does not disprove that it was left there, as it was shown there was opportunity to dispose of it, and the arrest of Carroll had taken place under Diamant's window and in plain sight.

There is no proof as to just what became of this 15,000 ounces of gold, but there was abundant and overwhelming evidence that none of it was used in the manufacture of jewelry. According to the Cash Receipts Book, Sheba sold the whole of an entire output for that period of approximately 10,000 bracelets to Frank Brooks of 712 Poplar Street, Philadelphia, at a total price of approximately $600,000. An employee of the Carroll Instrument Co., who worked on the same premises, and who was in the same room where Sheba's machinery was located every working day from July 2, 1951 until March, 1952, testified that he had never seen that machinery being operated, or any jewelry made, or any gold; that the machines were dusty and dirty and covered with cobwebs; and that although he left the premises about 5:30 in the afternoon each day, Carroll, who came to the place for approximately one-

---

14. "Rule 52(a): Harmless Error. Any error, defect, irregularity or variance which does not affect substantial rights shall be disregarded."

half hour each afternoon, always left the premises before he did.

When the Treasury agents inspected the place in July, 1951, with Carroll's consent, they also noticed the dusty and unused condition and position of the machinery. They asked Carroll about this and he explained that the machines were in that shape because a Mr. and Mrs. Popper who operated the machines had been on vacation ten days. This explanation was demonstrated to be false. The entry in the Cash Receipts Book showing the sales of the entire output to Frank Brooks was also false, for the owner of the whole of the premises at 712 Poplar Street, Philadelphia, testified that he had lived there for 26 years, had never heard of Frank Brooks, that no person by the name of Frank Brooks had ever lived at that address, and that he knew of no such person. No witness was produced to show what became of this 15,000 ounces of gold; no person was produced to show that he had been employed to manufacture bracelets or anything else from this gold. If bracelets were sold to some person other than Frank Brooks there was no apparent effort made to produce such person.[15]

The error in denying the Newbrand reports to the defendants was harmless "because the Government's case was overwhelming." United States v. Chieppa, supra, 241 F.2d at page 640. It is plain that here, as in United States v. Raspovich, 2 Cir., 241 F.2d 779, 781: "What must have convinced the jury beyond a reasonable doubt that appellants were guilty as charged, and what has produced in our minds a settled impression that the error lacks substance, is the overwhelming evidence of the various witnesses, which tallies perfectly with the exhibits and the attendant circumstances." As in Lutwak v. United States, 344 U.S. 604, 619, 73 S.Ct. 481, 490, 97 L.Ed. 593, "This record fairly shrieks the guilt of the parties."

Appellants list as a further point involved in their appeal the denial of a speedy trial. The record shows that during the pendency of the case against them the defendants themselves repeatedly and successfully sought delay and further time in which to prepare for their defense. Their complaint upon this point is a frivolous one.

Finally the appellants make the following purported assignment of error: "8. That the Court below erred in various respects in refusing to admit certain evidence on behalf of the defendants and with respect to the adequacy of the charge to the jury." That is not the succinct statement of a question involved contemplated by our Rule 17.[16] Nevertheless we have examined the evidence and the instructions sought to be referred to here by the appellants. We find no error in respect to any of these matters. Furthermore, after the charge

---

15. A feeble effort to produce evidence that there had been a Frank Brooks of 712 Poplar Street, Philadelphia, was made when the defense issued a subpoena under which an officer of a Philadelphia bank appeared and testified that an account had been opened in that bank in the name of Frank Brooks of 712 Poplar Street, Philadelphia, on September 22, 1949. The account was closed on June 29, 1950. The witness had never seen the person who had opened the account, but testified that the records which he produced showed that it was "a very peculiar account" in that it indicated that the intention of the depositor who had opened the account with $200 was merely to keep the account at that amount, and that when deposits were made, checks for substantially the same amounts would be presented on the same day so that the account ran along for the two months in which it was actually active with a running balance of only about $200. This evidence would be as likely to indicate that the account was fictitious or simulated as that there was a person by the name of Frank Brooks of 712 Poplar Street.

16. Rule 17, 28 U.S.C.A. reads in part as follows: "Briefs. (a) Contents of Appellant's Brief. The brief for appellant or petitioner shall contain in the order here stated—(1) A concise abstract or statement of the case, presenting succinctly the questions involved, the manner in which they are raised, and the errors claimed; * * *".

was given, none of the defects now claimed by appellants were stated as ground of objection as required by Rule 30, Rules of Criminal Procedure. The evidence rejected related to periods long prior to the dates material here, and was wholly irrelevant.

The judgments are affirmed.