**UNITED STATES of America**
**v.**
**John RADFORD.**
Crim. No. 26756.

United States District Court
District of Maryland.
April 9, 1965.

Thomas J. Kenney, U. S. Atty., Baltimore, Md., for plaintiff.

Arthur W. Kupfer, Baltimore, Md., for defendant.

THOMSEN, Chief Judge.

Defendant, who has been indicted for the armed robbery of the People's National Bank, Adelphi office, on November 6, 1964, has moved to suppress, on the ground of illegal search and seizure, any items taken from his automobile by agents of the Government after his arrest, despite the fact that the articles were taken pursuant to a search warrant obtained by the agents. Hearings have been held at which testimony was taken and counsel for the Government and for defendant were heard.

On November 6, 1964, at about 9:23 a. m., a small branch of the bank, located at Adelphi, Prince George's County, Maryland, was robbed by a single robber carrying a dark hand gun and wearing what one witness described as horn-rimmed glasses and one referred to as false glasses. Shortly after the robbery a witness, while being questioned by an FBI agent, identified a photograph of defendant as that of the robber. Another witness stated that the robber had escaped in a light beige or tan Corvair, bearing Maryland license plates DV–1674 or DU–1674. The FBI discovered that defendant owned a Corvair automobile bearing Maryland plates DP–1674, and some time before 2:00 p. m. on the

same day an agent obtained a warrant for his arrest.

Defendant is a hearing-aid salesman, and the FBI learned that he was expected to call at the office of the Beltone Company at 1402 New York Avenue, N.W., Washington, D. C., that afternoon about 3:00 or 4:00 o'clock. Special Agent Mc-Dermott, the Assistant Agent in Charge of the Washington Field Office, and Agents McDonald and Ford waited there to arrest him. At 3:40 p. m. defendant left his Corvair automobile, bearing Maryland plates DP–1674, with an attendant at the PMI parking garage at 1407 New York Avenue, N.W., removing the keys but leaving in the car a club bag and a tall cuboid box or case containing an audiometer, a machine for testing hearing. An attendant parked the car, and defendant had his hair cut before going to the Beltone office. He was promptly arrested by the three agents awaiting him there, and was advised of his rights, including his right to a lawyer. Defendant replied that he had had lunch with his lawyer. He was searched, and his keys and the parking stub were taken by the agents. Defendant said that he had no gun on his person, but that he had two guns, one at home and one in the car, which he carried to protect himself because he often collected up to $1,000 in cash. He denied having committed the robbery.

Meanwhile, Special Agent Bernard Buscher, who had observed the Corvair enter the parking garage, joined the group. When defendant was taken to the FBI field office for processing, Buscher took the parking stub and the keys to the garage and arranged with the manager to have the Corvair "checked out" but left in the garage, where it was to be closely watched by teams of FBI agents until a search warrant could be obtained. From 4:49 p. m. on November 6, when the car was "checked out", until shortly after noon the next day the Corvair was kept under surveillance by several two-agent teams, who relieved each other from time to time. If anyone had approached the car the agents would not have permitted him to remove the car or any of its contents, but no one came for or approached the car while it was under surveillance.

It was thought until just before one of the agents was called to testify at the hearing on the pending motion that none of the agents had entered the car until the search warrant was obtained the next day. However, during the hearing two agents, not those named in this opinion, revealed for the first time and testified that about 10:00 p. m. on November 6, while they had the Corvair under surveillance at the parking garage, they became curious to learn if there was anything in the car that might relate to the bank robbery. Accordingly, contrary to their instructions, they unlocked the car, and admittedly removed and opened the case which contained the audiometer. I find that they also opened the club bag, which contained numerous pamphlets and other sales material, as well as the gun, which was in a paper bag. Both of them deny having pursued their search far enough to find the gun. I conclude from their testimony and their bearing that they repented of their mistake before eating the whole apple, and that after seeing the papers in the club bag they did not pursue their search further, but replaced the cases and locked the car door. I am satisfied from all the evidence that they did not tell anyone that they had opened the door of the car or had seen any of its contents until just before one of them took the stand during the hearing on this motion.

Meanwhile, about 6:00 p. m., Special Agent Dowling had been assigned the duty of obtaining a warrant for the search of the Corvair, and had prepared some notes for an affidavit, based on the information obtained from the agents who had interviewed the witnesses and employees of the bank. He also viewed the line-up that evening when defendant was identified as the robber by one or more of the witnesses. The next morning he conferred with Assistant United States Attorney Brown, and prepared and

swore to the final draft of the affidavit upon which the search warrant was issued by Commissioner Wertleb. I find that neither Dowling nor anyone else who had anything to do with the preparation of the affidavit or the issuance of the warrant knew or had been told anything about the opening of the car door or the search by the two agents. On the other hand, three or four agents had heard defendant say at the time of his arrest that he had a gun in the car. The warrant was issued a little before noon on November 7, shortly after defendant's preliminary hearing, which had been delayed by the unavailability of a commissioner. Agents Dowling and McDonald took the warrant to the parking garage, where the two agents were on duty. Agent Dowling then drove the car to the basement of the FBI Identification Center at 2nd and C Streets, where it was photographed and searched by Agents Dowling, McDonald, and the two agents. Agent Dowling searched the club bag, discovered and seized the gun, an Astra automatic, and two small boxes or cases containing spectacle frames and other items not material to this motion, which were kept by the FBI. The other contents of the car and the car itself were delivered to defendant's wife the same day.

■ Defendant argues that the "actual seizure" of the car was at 4:49 p. m. on November 6, when the agents, having obtained the keys and the parking stub from defendant, began their surveillance of the car with the intention of preventing anyone from driving the car away or removing anything from it until the agents had been able to obtain a search warrant. Since no one representing defendant attempted to obtain possession of the car or of anything contained therein, the situation may more properly be described as surveillance of the car with the intention of seizing it if necessary. The difference is immaterial, because under all the circumstances shown by the evidence, including the information indicating that the car had been used for the get-away after the robbery and defendant's own statement to the agents that there was a gun in the car, the agents would have been justified in seizing the car, whether it was in motion or parked, in order to prevent the removal of any instruments or fruits of the crime which might be found therein, or to photograph the car, or both. Preston v. United States, 376 U.S. 364, 84 S.Ct. 881, 11 L.Ed.2d 777 (1964); United States v. Sutton, 4 Cir., 321 F.2d 221 (1963); United States v. Walker, 4 Cir., 307 F.2d 250 (1962). If the car had been left by defendant on a public highway, the agents would have been justified in removing it to a safe place for surveillance and possible seizure until they could obtain a warrant authorizing the search of the car and the seizure of any evidence of the crime found therein, as well as instruments and fruits of the crime. Seizure of the car for the purpose of guarding it until a search warrant could be obtained would not amount to a search of the car and the seizure of any items found therein.

■ Defendant further argues that when the two agents entered the car they must have seen the gun and the frames, that this knowledge must have been communicated to the agents who obtained the search warrant, and that the warrant and the search and seizure made pursuant thereto were invalid, under the "fruit of the poisonous tree" doctrine. Silverthorne Lumber Co. v. United States, 251 U.S. 385, 40 S.Ct. 182, 64 L.Ed. 319 (1920); Nardone v. United States, 308 U.S. 338, 60 S.Ct. 266, 84 L.Ed. 307 (1939).

The Court will assume for the sake of the argument that the two agents did in fact see the gun and the frames. But the Court is satisfied from all the evidence that they did not tell the agents who prepared the affidavit and obtained the search warrant, or anyone else, that they had opened the door of the car or seen any of its contents. The affidavit and the warrant were not based upon what the two agents saw or upon any leads resulting from their acts, but were based entirely upon independent sources,

set out in the findings of fact above. As Judge Clark said in United States v. Paroutian, 2 Cir., 299 F.2d 486 (1962), at page 489:

"An unlawful search taints all evidence obtained at the search or through leads uncovered by the search. This rule, however, extends only to facts which were actually discovered by a process initiated by the unlawful act. If information which could have emerged from an unlawful search in fact stems from an independent source, the evidence is admissible. Silverthorne Lumber Co. v. United States, supra, 251 U.S. 385, 391–392, 40 S.Ct. 182, 64 L.Ed. 319; United States v. Sheba Bracelets, Inc., 2 Cir., 248 F.2d 134, certiorari denied 355 U.S. 904, 78 S.Ct. 330, 2 L.Ed.2d 259."

See also the second appeal in United States v. Paroutian, 319 F.2d 661 (1963), and Parts Mfg. Corp. v. Lynch, 2 Cir., 129 F.2d 841, 143 A.L.R. 132 (1942). In the instant case the search warrant and its supporting affidavit were based *solely* upon adequate independent sources.

The motion to suppress is hereby denied.