UNITED STATES of America,
Appellee,

v.

Antranik PAROUTIAN, Defendant-Appellant.

No. 96, Docket 27038.

United States Court of Appeals
Second Circuit.

Argued Oct. 13, 1961.

Decided Feb. 9, 1962.

C. Joseph Hallinan, Jr., New York City, for defendant-appellant.

Jerome C. Ditore, Asst. U. S. Atty., E.D.N.Y., Brooklyn, N. Y. (Joseph P. Hoey, U. S. Atty., Brooklyn, N. Y., on the brief), for appellee.

Before CLARK, WATERMAN, and MOORE, Circuit Judges.

CLARK, Circuit Judge.

Antranik Paroutian appeals from his conviction of knowingly and unlawfully receiving and concealing a narcotic drug, heroin hydrochloride, and of conspiring with another to import this drug into the United States, to receive, conceal, and sell it, and to facilitate its transportation, concealment, and sale—all in violation of 21 U.S.C. § 174. At a preliminary hearing Paroutian, who had been extradited from Lebanon to answer the indictment, moved to suppress certain evidence on the ground that it was obtained through a lead uncovered during an unlawful search of his apartment, and was thus a "fruit of the poisonous tree." The motion was denied, and the evidence was admitted. We are here called upon to decide whether such action was prejudicial error; whether this evidence was so "tainted" that its admission violates the exclusionary policy of Weeks v. United States, 232 U.S. 383, 34 S.Ct. 341, 58 L.Ed. 652, and Nardone v. United States, 308 U.S. 338, 60 S.Ct. 266, 84 L.Ed. 307.

On April 5, 1958, M. Sicot, Secretary General of the International Criminal Police Organization (Interpol), sent a letter to the Commissioner of Narcotics, Treasury Department, in Washington, D. C., requesting information as to Gabriel Graziani, a French subject who had been arrested in Geneva for cashing stolen Canadian securities and who was suspected of engaging in the drug traffic. This letter included the information that Graziani owned an apartment in New York, at 118–09 83d Avenue, Kew Gardens. In response to this request Agent Martin F. Pera of the Bureau of Narcotics, United States Treasury Department, and members of the New York police department entered Graziani's apartment on April 18, 1958. They had no search warrant. They were accompanied by Martin Spolan, agent for the owner of the apartment building. In the course of this search Spolan noticed that one of the closets in the apartment had a new cedar lining, and indicated that it must have been installed by the occupants of the apartment. When this was brought to the officers' attention they tapped the cedar lining and then took a screwdriver and hammer and unsuccessfully tried to remove the lining from the wall. On April 20, Agent Pera returned to the apartment, again without a warrant. This time he was accompanied

by one Feiler, a friend of both Graziani and Paroutian, who indicated that Paroutian shared the apartment with Graziani. In the course of this visit Agent Pera found a photo of appellant and several other pictures, which he took.

On May 19, 1958, the owner of the apartment house secured a court order dispossessing Graziani from the apartment for nonpayment of rent. On June 19, 1958, agents of the Bureau of Narcotics entered the apartment, now unoccupied, with permission of the apartment house owner. On this occasion they made a thorough search of the cedar closet and discovered that it contained a secret compartment, in which were cached a bag containing heroin hydrochloride and an unsigned letter. At trial both the drug and the letter, which was identified by a witness as having been written by Paroutian, were introduced. They constitute the core of the government's case, so that if their admission was erroneous the judgment of conviction must be reversed.

■■ The searches on April 18 and 20, 1958, were unlawful. It is unclear from the evidence whether Paroutian had paid the rent for the month of April. There was no indication, however, on April 18 and 20 that he did not intend to return to the apartment. Either because the rent had been paid or because he felt it would be forthcoming, the landlord made no efforts to evict Paroutian and Graziani until several weeks later. Thus Paroutian was legitimately on the premises and is entitled to invoke the right of privacy guaranteed by the Fourth Amendment. Jones v. United States, 362 U.S. 257, 80 S.Ct. 725, 4 L.Ed.2d 697; Steeber v. United States, 10 Cir., 198 F. 2d 615, 33 A.L.R.2d 1425. It is admitted that no warrant was procured before the searches. Such a search can be justified only as incident to a lawful arrest or under exceptional circumstances which make it impractical to secure a warrant through orderly procedure. Johnson v. United States, 333 U.S. 10, 68 S.Ct. 367, 92 L.Ed. 436. Hence no justification is shown for this search, as indeed the judge below held.

At least several days must have elapsed between receipt of the Interpol letter and the search. There is no showing of any reason why the few hours necessary to secure a warrant could not be spared; the apartment, with its cache of heroin, went unmolested for two months thereafter. Here the only permissible inference is that the agents were careless or feared they had not amassed sufficient evidence to support issuance of a warrant. These facts demonstrate the recurrent need to suppress logically relevant evidence if acquired unlawfully, even where it may mean that a criminal will go free. For in these circumstances the agents willfully or negligently ignored judicial admonitions, constantly reiterated, that each one of us, suspected criminal or no, is entitled to security in our persons, houses, papers, and effects until an impartial magistrate determines that the enforcement officers have probable cause to believe the law has been violated.

The question presented, therefore, is whether the evidence actually seized in the third search, which, occurring after Paroutian was out of possession of the premises and lawful under Jones v. United States, supra, 362 U.S. 257, 80 S.Ct. 725, 4 L.Ed.2d 697, is "tainted" by the first two illegal searches.[1] The purpose of the rule against admission of illegally seized evidence is the protection of the right to privacy; by quarantining evidence gathered in this manner it is hoped that the zeal of enforcement agencies for such methods of procuring evidence will be curbed. "[T]here is but one alternative to the rule of exclusion. That is no sanction at all." Murphy, J., dissenting

---

1. Defendant asserts that not only are the heroin and the letter "fruit of the poisonous tree," but also the pictures and the testimony of five witnesses which, it is alleged, flowed from the discovery of the pictures. At the preliminary hearing, however, defendant moved to suppress only the drug and the letter, and for that reason we do not here consider whether the other evidence should have been excluded.

in Wolf v. People of State of Colorado, 338 U.S. 25, 41, 69 S.Ct. 1359, 93 L.Ed. 1782. Consistent with this broad purpose the rule extends beyond evidence directly seized in an unlawful search, to prescribe use of all evidence obtained as an indirect result of such illegal activity—the "fruit of the poisonous tree." Silverthorne Lumber Co. v. United States, 251 U.S. 385, 40 S.Ct. 182, 64 L.Ed. 319. See Nardone v. United States, 308 U.S. 338, 60 S.Ct. 266, 84 L.Ed. 307; United States v. Coplon, 2 Cir., 185 F.2d 629, 28 A.L.R.2d 1041, certiorari denied 342 U.S. 920, 72 S.Ct. 362, 96 L.Ed. 688.

■■ An unlawful search taints all evidence obtained at the search or through leads uncovered by the search. This rule, however, extends only to facts which were actually discovered by a process initiated by the unlawful act. If information which could have emerged from an unlawful search in fact stems from an independent source, the evidence is admissible. Silverthorne Lumber Co. v. United States, supra, 251 U.S. 385, 391–392, 40 S.Ct. 182, 64 L.Ed. 319; United States v. Sheba Bracelets, Inc., 2 Cir., 248 F.2d 134, certiorari denied 355 U.S. 904, 78 S.Ct. 330, 2 L.Ed.2d 259. On the other hand, a showing that the government had sufficient independent information available so that in the normal course of events it might have discovered the questioned evidence without an illegal search cannot excuse the illegality or cure tainted matter. Such a rule would relax the protection of the right of privacy in the very cases in which, by the government's own admission, there is no reason for an unlawful search. The better the government's case against an individual, the freer it would be to invade his privacy. We cannot accept such a result. The test must be one of actualities, not possibilities.

Yet the government seems to urge just such a "possibility" rule in this case. It does not deny that the two searches in April 1958 were unlawful. Nor does it deny that Spolan's statement about the cedar lining, elicited at the April 18 search, led Agent Pera to investigate the closet at that time. It claims, rather, that the evidence seized on June 19 had an independent source; that it was the letter from Interpol, informing the Bureau of Graziani's suspected drug activities and giving the address of the apartment in Kew Gardens, which led to the discovery of the secret compartment in the cedar closet.

■■ We cannot accept this contention. The extreme interest in the closet shown by the agents on the first unlawful search demonstrates that it was Spolan's statement about the closet lining which ultimately led to the discovery of the heroin and the letter. Of course, even without an unlawful search, the agents might have found the secret compartment. But that is not what happened. Since the search was illegal, and defendant has introduced substantial evidence showing that the heroin and the letter were uncovered as a result of this illegal search, the burden shifted to the government, which then was under an obligation to prove that its evidence had an independent origin. United States v. Coplon, supra, 2 Cir., 185 F.2d 629, 28 A.L.R.2d 1041, certiorari denied 342 U.S. 920, 72 S.Ct. 362, 96 L.Ed. 688; United States v. Goldstein, 2 Cir., 120 F.2d 485, affirmed Goldstein v. United States, 316 U.S. 114, 62 S.Ct. 1000, 86 L.Ed. 1312 (dictum). Had the government shown that it had knowledge of the secret compartment from an independent source, the evidence would of course have been admissible. Parts Mfg. Corp. v. Lynch, 2 Cir., 129 F.2d 841, 842, 143 A.L.R. 132, certiorari denied 317 U.S. 674, 63 S.Ct. 79, 87 L.Ed. 541. As the prosecution failed to show any source for its information other than the illegal search, however, we hold that the failure to suppress this evidence was prejudicial error.[2]

2. It is true that Agent Pera, in his affidavit of March 24, 1960, received at a preliminary hearing to determine the court's jurisdiction, stated that the search on June 19, 1958, was "predicated on the basis of information which I had received that Graziani and Paroutian had maintained a secret compartment within

Because we take this view of the case we need not discuss many of the other errors alleged by defendant. Two, however, require further discussion. They are Paroutian's claims that he was denied due process at the hearing to determine the court's jurisdiction and that he has been tried for a crime other than that for which he was extradited from Lebanon.[3]

█ There can be no question but that the hearing was fair. Defendant claims that a variety of errors was committed at this hearing, including introduction of hearsay and failure to appoint an interpreter. Since there were no questions of fact at issue in this proceeding requiring Paroutian to testify or understand the proceedings, we do not think that the absence of an interpreter amounted to a denial of a fair hearing. Defendant claims that as a result of the denial his attorney was forced to act as interpreter, and thus could not fulfill his normal functions. Save for this bald assertion defendant has not demonstrated how this or any other alleged error worked to his prejudice. His basic claim is that he was extradited for one crime and tried for another; but nothing that occurred at the hearing impaired his ability to present this claim or gave the government any unfair advantage in rebutting it. We turn, therefore, to a consideration of the merits of this contention.

█ The document sent by the United States Embassy in Lebanon to the Lebanese government included a copy of an indictment, issued in the Southern District of New York, for conspiracy to violate 21 U.S.C. §§ 173, 174. The Lebanese Warrant of Extradition states that Paroutian was being returned to the United States because he was accused of narcotics trafficking. Moreover, the transcript of the Lebanese extradition proceedings indicates that the Lebanese officials had in their possession Agent Pera's affidavit of March 24, 1960. In this he stated that he had found heroin in the apartment which Paroutian shared with Graziani, and that Graziani had admitted he and Paroutian imported heroin into the United States.

█ Paroutian claims that since he was tried not under the Southern District indictment, but under a later indictment issued in the Eastern District of New York on September 1, 1960, which, as finally constituted, included two counts —receipt and concealment of heroin— not covered by the indictment sent to Lebanon, he has been tried for a crime other than that for which he was indicted. This, he claims, violated principles of international law laid down in United States v. Rauscher, 119 U.S. 407, 7 S.Ct. 234, 30 L.Ed. 425. Accepting the proposition that these principles would forbid trial of Paroutian for murder or some other offense totally unrelated to the traffic in narcotics, we nevertheless believe that Paroutian was tried in conformity with the law governing extradition. The basis of this rule, discussed in United States v. Rauscher, supra, 119 U.S. 407, 7 S.Ct. 234, 30 L.Ed. 425, is comity. It is designed to protect the extraditing government against abuse of its discretionary act of extradition. So the

the walls of Apartment 3F." This quite ambiguous statement, not mentioned elsewhere in the record, does not indicate where he obtained his knowledge or satisfy the prosecution's burden. Other statements from Pera indicate that he had had no further communication or information from Interpol or advice from third persons, thus leaving the information acquired on his earlier search as his only source.

3. Defendant claims that Count Three of the indictment does not state a crime, in that it charges him with conspiring to "import and receive" drugs, and it is impossible, defendant says, to import without receiving. Whatever the merits of this contention, it is clear that it is possible to conspire to do both, and thus defendant's claims are without merit. Milanovich v. United States, 365 U.S. 551, 81 S.Ct. 659, 5 L.Ed.2d 710, cited by defendant to support his claim, involved the question whether a defendant could be convicted for both stealing and receiving the same goods, and is inapposite.

test whether trial is for a "separate offense" should be not some technical refinement of local law, but whether the extraditing country would consider the offense actually tried "separate." Here we do not believe that the Lebanese, fully apprised of the facts as they were, would consider that Paroutian was tried for anything else but the offense for which he was extradited, namely, trafficking in narcotics. Therefore there can be no objection to trial under the September 1960 indictment. See Greene v. United States, 5 Cir., 154 F. 401, certiorari denied 207 U.S. 596, 28 S.Ct. 261, 52 L.Ed. 357.

Defendant launches a bitter attack, heavily larded with statistics, upon the conduct of the trial by the trial judge, and the extensive questioning of the witnesses by the court. In fact the attack is so bitter and so extreme as to defeat its own ends and we shall not pass upon the claim of error. We do suggest that it makes only for friction and potential assignment of error when the conduct of the trial is taken out of the hands of experienced counsel who are not disclosing an inability to bring out the truth. On a retrial, if had, we believe the court will be well advised to reduce its interposition sharply. Cf. United States v. De Sisto, 2 Cir., 289 F.2d 833.

Reversed and remanded.

MOORE, Circuit Judge (dissenting).

The decision of the majority illustrates the dangers inherent in a system of formulistic jurisprudence. In mechanically applying the "fruit of the poisonous tree" doctrine, the majority in my opinion fail to give adequate recognition to the fact that a decision in this case necessitates the balancing of two conflicting interests: (1) the protection of citizens from unreasonable searches and seizures; and (2) the need for a vigorous administration of the criminal law. See Nardone v. United States, 308 U.S. 338, 60 S.Ct. 266, 84 L.Ed. 307, 1939.

The rule that evidence obtained as a result of an illegal search cannot be admitted against a party who has standing to challenge the search was adopted to dissuade government agents from using illegal procedures to obtain evidence, and although specific evidence might be excluded for that reason, it was not intended to grant immunity to the criminal whose rights were violated. Thus, it has been recognized that if the government can show that the evidence was available through a completely independent source, it is admissible, even though it consists of the same material that had previously been illegally seized. Silverthorne Lumber Co. v. United States, 251 U.S. 385, 40 S.Ct. 182, 64 L.Ed. 319, 1920; Nardone v. United States, supra. The courts are left, therefore, with the difficult problem of determining if the evidence that the government seeks to introduce has been obtained independently of the illegal acts of government agents.

In resolving this problem, the majority has not heeded the words of Mr. Justice Frankfurter when, in discussing the admissibility of evidence obtained as a result of the use of wiretaps, he said:

"Sophisticated argument may prove a causal connection between information obtained through illicit wire-tapping and the government's proof. As a matter of good sense, however, such connection may have become so attenuated as to dissipate the taint. A sensible way of dealing with such a situation * * ought to be within the reach of experienced trial judges." [Nardone v. United States, supra, 308 U.S. at 341, 60 S.Ct. at 268.]

To see the issue clearly in this case, it is necessary to know what information the government obtained during the course of the illegal search and how it related to the evidence found during the legal search. During the course of an illegal search on April 18, 1958, Agent Pera noticed that one of the closets was lined with cedar panelling and, in response to a question by him, Martin Spolan, the agent of the landlord, informed Pera that the closet had been lined after Paroutian and Graziani

moved into the apartment (Tr. 413). On June 19, 1958, in the course of a legal search, narcotics agents found heroin and a letter hidden in a secret compartment in the cedar lined closet. It is this evidence which the defendant sought to have excluded.

It is important to note that the information obtained during the course of the search of April 18th did not give the agents additional grounds for believing that narcotics were cached in the apartment; nor did it establish that there was a secret compartment. The most that this information did was to give the agents an idea as to where to begin the search of the apartment when they returned on June 19th. In other words, all that Pera learned during the illegal searches was that there was cedar panelling in the closet. The fact of its installation after Paroutian and Graziani were in occupancy was ascertained as a result of legal questioning, not from an illegal search.

No leads or clues as to the existence of the hidden narcotics were obtained from the illegal searches. Only after Paroutian and Graziani had been legally dispossessed did Pera return. At such time, the agents were free to explore the entire apartment. They might have found heroin under the rugs, in kitchen cracks, or behind plastered walls. Had they discovered heroin hidden in any of these places, it is doubtful that even the majority would question the admissibility of such evidence. That the panelling had been previously observed had no more legal significance than the fact that the narcotics agents had learned where Paroutian and Graziani lived or had noticed the general construction of the apartment.

In the light of these circumstances, it is unreasonable to hold that the government may not introduce the evidence discovered on June 19th. Although the majority concedes that this evidence can be introduced if on a new trial the government can present additional proof that the excluded evidence had an independent source, I see no need for additional proof of its independence. A realistic appraisal of the facts presented to the district court compels the conclusion that the narcotics and letter would have been found on June 19th, even if there had not been a search on April 18th. Agent Pera, who originally expressed interest in the cedar lining and elicited the information that it had been recently installed, was present during the search of June 19th. Also, there was in evidence, as part of the hearing on jurisdiction, an affidavit by Agent Pera in which he stated that the search of June 19th was predicated on the basis of information which he had received that Graziani and Paroutian had maintained a secret compartment in the walls of the apartment. In my opinion, these facts conclusively establish that the government was not benefited by the search of April 18th and, therefore, there is no more reason to exclude the letter and heroin from evidence than there would be to grant appellant absolute immunity from future prosecution.

While I believe that the judgment of the district court should be affirmed because the evidence was found on June 19, 1958, independently of the search of April 18, 1958, one further point should be considered. Assuming *arguendo* that the heroin and letter would not have been found had it not been for the search of April 18th, does the fact that knowledge of the place where contraband is hidden arises from an illegal search taint the seizure of it? The authority in this Circuit would seem to indicate that it does not. Writing for an unanimous court in Parts Mfg. Corp. v. Lynch, 2 Cir., 1942, 129 F.2d 841, a case in which the government's knowledge of the location of the seized goods was founded solely on information obtained as a result of a prior illegal seizure, the author of the majority opinion in the instant case said:

"any illegality would have to rest on the single fact that the Assistant United States Attorney knew where the parts were. If we so

held we would say in effect to appellant: Since the first seizure was illegal, you now have a chance to spirit away the evidence, for no search can be made until sometime after the FBI has lost track of its whereabouts. The protection of the Fourth Amendment is not to be secured by adopting the rules of hide and go seek * * * It is too much to hold that in order to obliterate the original illegal seizure an otherwise exemplary procedure must be thrown over because the government did not close its eyes and lose track of the stolen parts." [129 F.2d at 843.]

If the fact that the government knew of the location of goods to be seized only because of a prior illegal seizure does not invalidate the seizure of those goods, then a seizure should not be invalidated merely because an illegal search provided the government with a clue to the location of the seized goods.

I would affirm.