### UNITED STATES of America, Appellee,

v.

### Michael and Janet FALLEY, Appellants.
### No. 220, Docket 73–1660.

United States Court of Appeals, Second Circuit.

Argued Sept. 28, 1973.

Decided Nov. 28, 1973.

\* \* \* \* \*

Oakes, Circuit Judge, concurred in part and dissented in part, with opinion.

Robert Polstein, New York City (Orans, Elsen & Polstein, and Anthony J. Ferrara, Jr., New York City, of counsel), for appellants.

Robert L. Clarey, Asst. U. S. Atty., Brooklyn, N. Y. (Robert A. Morse, U. S. Atty., for the Eastern District of New York, Brooklyn, N. Y., and L. Kevin Sheridan, Asst. U. S. Atty., of counsel), for appellee.

Before MOORE, MULLIGAN and OAKES, Circuit Judges.

MOORE, Circuit Judge:

Appellants Michael and Janet Falley, together with David Stolzenberg, Marcia Stolzenberg and Nicholas Christon, were charged in eight substantive counts with violations of Section 2(h) of the Narcotic Drugs Import and Export Act, 21 U. S.C. § 176a and the Comprehensive Drug Abuse Prevention and Control Act of 1970, 21 U.S.C. § 801 *et seq.* and in a ninth count with conspiracy to violate said laws. At the close of the government's case, the trial court dismissed the indictment as to Marcia Stolzenberg, dismissed counts 2 and 6 as to her husband David Stolzenberg, and counts 7 and 8 as to all defendants. The jury returned a verdict of guilty as to the Falleys and David Stolzenberg on the conspiracy count but was unable to agree on the remaining substantive counts.

The indictment alleged that the named defendants and others had been importing hashish into the United States from June of 1970 through April of 1972. The government based its case mainly on the testimony of two informers—David Gibbons and Nicholas Christon. Christon testified to six substantive counts alleging that the conspirators had smuggled hashish into the United States from India in table tops and brass nameplates. No table tops, brass nameplates or hashish involved in any of those charges were ever produced by the

government. Gibbons testified that on two occasions, in October and December, 1970, he smuggled hashish into the United States from Morocco. None of that hashish was ever produced by the government. David Stolzenberg and the Falleys were each sentenced to a $15,000 fine and three years imprisonment on a conspiracy count. In addition Michael Falley was adjudged guilty of two separate contempts of court for refusing to produce his and his wife's passports. He was sentenced to fifteen days imprisonment upon each contempt.

The indictment alleged that during a two year period, beginning approximately April, 1970 and ending in approximately April, 1972, appellants, together with their co-defendant David Stolzenberg, engaged in smuggling some two thousand pounds of hashish from locations in Spain, Morocco and India into the United States for resale to distributors of hashish in the New York area. The government claimed that defendants accomplished this primarily by arranging for the concealment of quantities of hashish inside table tops and brass nameplates which were then shipped from Morocco, Spain or India to dummy companies set up for this purpose by appellants and Stolzenberg in New York. The individual shipments ranged in weight from fifty to one hundred pounds and occurred on a more or less monthly basis during this two year period. In addition, there was also testimony that on occasion the conspirators had received smaller quantities of hashish from abroad through a courier, David Gibbons.

In order to prove this smuggling scheme, the government relied on the testimony of two accomplice witnesses, Gibbons, the courier, and Christon, whose function in the conspiracy was to act as a salesman to middle level distributors. Christon testified concerning the partnership arrangement between himself, appellants and David Stolzenberg and as to the arrangements whereby hashish, concealed in furniture and artifacts, would be shipped to the dummy companies. Christon further testified concerning nine separate hashish importations in which he had participated with appellants and Stolzenberg. The second accomplice witness, Gibbons, testified that on two separate occasions he had smuggled hashish into New York which he delivered to appellants and David Stolzenberg.

In order to corroborate Christon's testimony, the government called two airport customs brokers, Thomas Coscetta and Vito Pepitone. Through customs broker Coscetta, the government showed six separate shipments of brass nameplates from New Delhi, India, to Leo Importing Company, Inc., a corporation operated by the Falleys.

In order to bolster and corroborate Gibbons' testimony the government introduced into evidence a suitcase containing five kilograms of hashish together with small quantities of heroin and pharmaceutical paraphernalia. This suitcase, which belonged to Gibbons, had been seized on December 26, 1971, following a routine customs inspection of Gibbons' baggage at Kennedy Airport, during which the hashish was discovered. Gibbons, who had been arrested following this discovery, testified that this shipment of hashish was to be delivered to David Stalzenberg only, and had nothing to do with the Falleys. This attempted importation by Gibbons was wholly unrelated to the incidents which were the subject matter of the indictment.

To further corroborate the accomplice witnesses' testimony, the government put into evidence travel agency records and testimony by a travel agent showing that during the period charged in the conspiracy appellants and Stolzenberg had spent in excess of $20,000 for air fare alone and had traveled to Spain, Morocco and India. In addition, Judge Weinstein permitted the government to put into evidence the Falleys' 1970 and 1971 federal income tax returns.

During the course of trial Judge Weinstein ordered the Falleys to produce their passports pursuant to a gov-

ernment subpoena. Michael Falley, who had custody of both his wife's passport and his own, refused to comply with this order. For these refusals Judge Weinstein sentenced Michael Falley to consecutive sentences of 15 days in prison, to be served in addition to the sentence imposed upon him by the conspiracy count on which he was convicted.

## I.

■ The first error stressed by appellants was the introduction of the suitcase and the circumstances under which it was introduced. During the course of Gibbons' direct examination, the prosecuting attorney asked that a suitcase be accepted into evidence. A uniformed customs inspector brought the suitcase to the counsel table. The suitcase was admitted into evidence over the strenuous objection of defense counsel. The customs inspector in front of the jury then proceeded to remove some bags from the suitcase and to display them on the prosecution counsel's table. After he had removed several bags, the court ordered him to stop. At this point the prosecutor remarked: "Okay, I'll leave it in. If there are going to be that many, I'll leave it in." Appellant's Appendix at 100. Gibbons identified the suitcase as one which he had tried to bring into the United States on December 26, 1971. He then came down from the stand and identified the contents of the bags as hashish. A quantity of heroin and some hypodermic syringes were also found in the suitcase. After the identification Judge Weinstein ordered that the suitcase and its contents be removed from the courtroom because the odor emanating from it was marked and offensive.

Defense counsel protested vehemently throughout this presentation. Again and again he argued that the suitcase had no bearing on the case being presented against his clients. The prosecution responded that the relevance of the evidence would be established. Unfortunately, the prosecution's prediction never came true. In admitting the suit-

case, the trial court decided that it was brought into court for one reason only —to buttress the credibility of accomplice Gibbons. According to the trial court, the prosecution wanted to show that Gibbons' testimony was not entirely a figment of his imagination; it wanted to prove, in the most concrete way possible, that Gibbons was indeed a smuggler of hashish.

It must be remembered that no hashish connected with the conspiracy as to which the Falleys were convicted was ever produced. Although the suitcase and its contents, admittedly brought into this country by Gibbons, were relevant to brand him as a smuggler and supported the court's credibility theory to this extent, this relevance was outweighed by the prejudice which might have been engendered in the minds of the jury, which might easily have related the hashish to the Falleys. Had the narcotics, including the suitcase and the paraphernalia displayed here, been the subject of the indictment, their presence and introduction into evidence would have been proper—but they were not.

The thesis that the relevance of the exhibit was outweighed by its prejudicial impact upon the jury is strengthened by an alternative reading of the record.

The government was certain that there was a smuggling conspiracy but it apparently felt that it had to show some hashish to the jury in order to make the conspiracy more believable and concrete. It had not been able to produce any hashish actually imported by the Falleys so, in effect, it went out and borrowed some for the simple purpose of exhibition. The fact that the drugs produced at the trial could be peripherally related to the proceedings is more of an *ex post facto* rationalization of the prosecution's behavior than an accurate description of its motivation.

The government argues that the possibilities for confusion were neutralized by the instructions given by the court. It is true that when the suitcase was first introduced, the trial court admon-

ished the jury that ". . . the defendants are not being accused of having anything to do with this shipment. We are not trying that case at all." Appellants' Appendix at 100. Likewise, a short time later, when one of the defense attorneys asked for a limiting instruction for defendant Marcia Stolzenberg to the effect that neither the suitcase nor any of the testimony concerning the December, 1971 smuggling attempt had any substantive relation to any crime for which she was being tried, the instruction was granted and the court instructed the jury in the following words: "Yes, none of this has any bearing on the case of Marcia Stolzenberg." Appellants' Appendix at 103. However, when asked to give the same limiting instruction by counsel for the Falleys (something that it had already done in a general way), the court refused. Whatever prejudice and confusion was engendered by the presentation of the suitcase may well have been exacerbated by the unexplained fluctuation of the trial court's attitude.

Even if the trial court had given the requested limiting instruction, however, it is highly questionable whether the admission of the suitcase would then have been proper. Under the circumstances the court could not, with a mere verbal instruction, undo the sensation created by the introduction of this large quantity of illegal drugs into the courtroom. The prejudice, unfairly enlisted, would have undoubtedly continued to color the proceedings to defendants' prejudice.

## II.

At the outset of the trial, the government made it clear that it intended to produce evidence that appellants, together with their co-defendant, David Stolzenberg, had spent vast sums of money during the pendency of the conspiracy for which they stand convicted. Specifi-

cally, the prosecution introduced documents and testimony from a travel agent to the effect that appellants had spent $20,000 on air travel in two years. In addition to establishing the inference that such large sums of money were obtained illegally, the documentation of appellants' travel expenses supported the prosecution's claim that appellants had arranged drug transactions in numerous ports of call. For the most part, however, as the prosecution's summation indicates, the government was interested in establishing the hypothesis that these substantial expenditures were made possible by ill-gotten gains.[1]

The only foundation laid by the prosecution for the introduction of these expenditures consisted of a presentation of appellants' 1970 and 1971 income tax returns. These tax returns were offered early in the trial to negate the existence of any legitimate source of income or wealth to justify these expenditures. Basically, appellants argue that the income tax returns constituted an insufficient foundation for the introduction of the travel expenditures. They claim that the admission of the returns should have in turn been preceded by the laying of another, two-fold foundation. First, they argue that the government had the duty to prove that the appellants did not obtain the funds used for travel in a legal, though non-taxable manner (*e. g.*, by bank loan). Second, they claim that the government was also under an obligation to establish defendants' pre-conspiracy net worth.

Appellants' first argument can be easily disposed of. The Supreme Court has held that in most cases ". . . the Government is not required to negate every possible source of non-taxable income, a matter peculiarly within the knowledge of the defendant." Holland v. United States, 348 U.S. 121, 138, 75 S.Ct. 127, 137, 99 L.Ed. 150

---

1. In his summary the prosecutor made the following argument:

It all begins to mesh together. A man who in the space of less than two years has spent approximately $20,000 on air-

fare alone . . . . On a $7,000 salary in 1970 and a $3,000 salary in 1971 . . . .

Appellants' Brief at 26.

(1954). The only limitation on the operation of this principle is that the government may not "disregard explanations of the defendant reasonably susceptible of being checked." *Id.* There is no evidence in the record to indicate that appellants had offered such explanations to the government.

Appellants' second claim is that the law requires the prosecution, before it may attempt to imply an illegal source of income by producing· proof of expenditures that are inconsistent with the sources of revenue reported on a defendant's income tax return, to establish the defendant's pre-conspiracy "net worth." Appellants come to this conclusion by drawing an analogy between the case at bar and a group of cases known as the "net worth tax fraud" cases.

Since the "prohibition" era a "net worth theory" has been employed by the Treasury Department to convict persons of tax fraud. *See* Capone v. United States, 51 F.2d 609 (7th Cir. 1931); Guzik v. United States, 54 F.2d 618 (7th Cir. 1931). Under this theory the government would show that a defendant's reported sources of income could not possibly support his standard of living. The jury was then free to draw the inference that such defendant had earned more than he had reported on his income tax forms and was therefore guilty of tax fraud. This theory was a potent weapon in establishing taxable income from undisclosed sources when all other efforts failed. In fact this theory enjoyed such great success that the United States Supeme Court was led to remark that: "The net worth method . . . has evolved from the final volley to the first shot in the Government's battle for revenue, and its use in the ordinary income-bracket cases greatly increases the chances for error." Holland v. United States, 348 U.S. 121, 126–27, 75 S. Ct. 127, 131, 99 L.Ed. 150 (1954). In *Holland* the Supreme Court held, *inter alia,* that before the government could present to the jury a comparison of the defendant's reported income and his non-deductible expenditures, it must lay a foundation by establishing his opening net worth, *i. e.,* the total net value of the taxpayer's assets at the beginning of the period in question. When properly laid, this foundation reduces the number of possible legitimate hypotheses that can be adduced to explain the disparity between the defendant's income and his expenditure. Since the defendant could no longer argue that he maintained his lifestyle out of his general wealth, the possibility that the expenditures were made with unreported funds is thus made more prominent.

There is an obvious analogy between these tax fraud cases and the case before us where the government has attempted to introduce evidence of high living from which the inference may be drawn that criminally obtained funds were being used by the defendants. Appellants claim that the same restrictions ought to apply to this type of case as apply to the net worth cases; that the government must supply a foundation for the introduction of the travel expenditures by showing that appellants could not have financed their travels from their general wealth.

■ There is some authority which supports appellants' position. *See* Haas v. United States, 344 F.2d 56, 63–64 (8th Cir. 1965). However, the more widely accepted view seems to be that proof that a defendant is living far above the means provided by his disclosed income is of great probative value in a case involving a crime where the motive is financial gain. Furthermore, the establishment of a defendant's opening net worth is not necessary to permit admission of such evidence. Lack of proof of prior impecunity is a matter of weight and not a matter of admissibility. United States v. Goldenstein, 456 F.2d 1006 (8th Cir. 1972); United States v. Mirenda, 443 F.2d 1351 (9th Cir.), cert. denied, Verdugo-Medina v. United States, 404 U.S. 966, 92 S.Ct. 343, 30 L.Ed.2d 286 (1971); United States v. Crisp, 435 F.2d 354 (7th Cir. 1970, cert. denied, 402 U.S. 947, 91 S.Ct. 1640, 29 L.Ed.2d 116 (1971); United

States v. Brewer, 427 F.2d 409 (10th Cir. 1970).

This distinction between the treatment of the general net worth tax fraud cases and those cases, like the one at bar, where only a crime of financial gain is involved, results from the fact that in the former, the government generally relies for its conviction *exclusively* on the inference to be drawn from the financial evidence. Indeed, the entire theory was originally developed as a last resort, where no other evidence was admissible. In the typical case where a crime of financial gain is involved, however, the evidence presented by the prosecution will not be limited to a demonstration of financial discrepancy. Under ordinary circumstances, such a showing, standing alone, does not even make out a prima facie case. Therefore, although the same difficulty of refutation is inherent in both types of cases there is no danger in this case that a failure in refutation would be completely conclusive on the merits. There is, then, no need to surround the introduction of this financial evidence with the exceptional safeguards found in the net worth tax fraud cases. The admission of this proof was proper.

### III.

■ In addition to the suitcase, the income tax returns and the travel documents already discussed, the government relied upon the testimony of, and the various importation documents obtained from, Thomas Coscetta, the Falleys' customs broker. Those exhibits established that the Falleys had imported brass nameplates from India during the course of the alleged conspiracy. Although those shipments had been examined by, and passed through customs inspectors without incident, appellants argue that these exhibits provided "powerful corroboration" of the accomplice testimony adduced by the government. Furthermore, appellants assert that the importation documents could only have been discovered as a result of a tainted lead obtained by an illegal search of the Falleys' home.[2] Since appellants consider the Coscetta testimony and documents "fruit of the poisonous tree" they urge that those documents should have been excluded at trial. We disagree.

There is evidence to support the opinion of the trial judge that the investigation of the customs brokers was caused by information legally obtained. In fact, the evidence suggests that the investigation began before the illegal seizures at the Falley home. In addition, Agent Connolly was asked whether the broker search had been aided by the seizure of the Falleys' address book, and he responded that it had not.[3]

The investigating agents suspected that the narcotics were being imported from India. Such importations would logically be handled by customs brokers at the port of entry. It would have been only a question of time before the government by a so-called saturation investigation, or otherwise, would have discovered the broker and the importation documents. Even if the address book had shortened or facilitated the investigation, it did not supply fruit sufficiently poisonous to be fatal.

In Wong Sun v. United States, 371 U. S. 471, 487–488, 83 S.Ct. 407, 417, 9 L. Ed.2d 441 (1963), the Supreme Court stated that:

> We need not hold that all evidence is "fruit of the poisonous tree" simply because it would not have come to light but for the illegal actions of the police. Rather, the more apt question in such a case is "whether, granting establishment of the primary illegality, the evidence to which instant

2. Appellants claim that the documents were obtained from Mr. Coscetta and that his name was obtained by the government from an address book which the government concedes was seized illegally from the Falley home.

3. Q. Did you obtain the name Trans-Air Freight from any piece of paper taken from the Falleys' home the day of the arrest?
 A. No, I did not.
 Appellants' Appendix at 71.

objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint." Maguire, Evidence of Guilt, 221 (1959).

In United States v. Cole, 463 F.2d 163 (2d Cir.), cert. denied, 409 U.S. 942, 93 S.Ct. 238, 34 L.Ed.2d 193 (1972), the defendant suggested that the government's eavesdropping had been illegal and that it triggered the saturation investigation which uncovered the tax fraud scheme because it was the source from which the government first learned of that scheme. The trial court refused to suppress the findings of the investigation. The Court of Appeals, Friendly, *J.*, affirmed, holding that the interviews provided a separate and independent ground for the investigation and that these interviews were, all things considered, the efficient cause of the investigation, stating at 173:

While Farber candidly admitted that the personal expense deductions [the illegally obtained information] "must have played some part" in his decision, it is clear both that he would never have sought—or obtained—a saturation investigation on that ground alone and that he would have sought it—and in fact obtained it—on Benton's information alone [the legally obtained information]. Conduct is not a legal cause of an event if the event would have occurred without it. Prosser, Torts § 41 at 239 (1971 ed.).

■ Although the government has the burden of proving by a preponderance of the evidence, United States v. Schipani, 414 F.2d 1262 (2d Cir. 1969), that the evidence has not been tainted either indirectly or directly, an inquiry must first be made as to the cause of the investigation. If the investigation was in fact instigated by information that was discovered independently of the illegal intrusion and if the illegally obtained information would not have been, in and of itself, sufficient in the normal case to trigger this type of investigation, then the investigation has not been tainted and no indirect, derivative taint attaches to any of the evidence produced by the investigation. Second, the law focuses attention on the investigative findings themselves. If the evidence produced by the investigation was simply the normal output of that investigation, then the investigative findings have not been tainted directly.

### IV.

Finally, appellant Michael Falley claims that his contempt conviction should be vacated because he rightfully asserted his Fifth Amendment privilege against self-incrimination by refusing to turn over his own passport and that of his wife for use as evidence against him. We are not persuaded by his argument and we therefore affirm the contempt conviction.

■ The Fifth Amendment can only be invoked to protect books or documents under certain circumstances. Simply stated, the privilege can be invoked to protect one's own books which are in one's own possession and which are self-incriminatory. The guaranty does not apply without this tripartite unity of ownership, possession and self-incrimination.

■ Appellant's claim fails because the element of ownership is not present. Under the applicable federal regulations passports are declared to be the property of the government.[4] Just as in Davis v. United States, 328 U.S. 582, 66 S.Ct. 1256, 90 L.Ed. 1453 (1946), where the Supreme Court held that no Fifth Amendment guarantees interfered with the government's seizure of gasoline ration tickets because as a matter of statutory declaration they were publicly owned, Fifth Amendment guarantees are not relevant to this case.[5]

---

4. 22 C.F.R. § 51.9 reads as follows:
 A passport shall at all times remain the property of the United States and shall be returned to the Government upon demand.

5. It might be pointed out parenthetically that even if appellant could successfully maintain the position that passports are private documents, he would still have to face the fact

Because we believe that the exhibition of the suitcase and its contents before the jury and their introduction into evidence must have had a highly prejudicial effect upon the jury despite the trial court's cautionary statements and charge, we reverse and remand for a new trial as to the Falleys.

OAKES, Circuit Judge (concurring in part, dissenting in part):

I agree with Parts I, II and IV of the majority opinion, but not, however, with Part III. The two address books of appellants that were illegally seized were lost by the Government on the eve of trial. We must, therefore, "strictly scrutinize" the Government's claim—on which it has the burden of proof, United States v. Schipani, 414 F.2d 1262 (2d Cir. 1969), cert. denied, 397 U.S. 922, 90 S.Ct. 902, 25 L.Ed.2d 102 (1970)—that there was an independent source for the discovery of appellants' customs broker. *See* United States v. Huss, 482 F.2d 38, 52 (2d Cir. 1973) (destruction of tapes from illegal wiretaps foreclosed appellant from pursuing issue of taint). The Government and the majority opinion rely on Customs Agent Connolly's testimony that he only "cursorily" examined the illegally seized address books, and that he *would* have eventually obtained the name of the Falleys' customs broker anyway by some sort of "saturation" investigation. This he explained as his contacting by telephone individual customs brokers to determine whether they had documents relating to a Michael or a Janet Falley, a David or Marcia Stolzenberg or a company named "Barter, Unlimited." But in fact, Connolly had contacted by telephone what he said were "less than ten" of the brokers, of whom

there were indeed 98, when his investigation was, as the Government brief rather cryptically concedes, "short circuited." [1] Brief at 16. According to the testimony of Coscetta, the Falleys' customs broker, it would be "virtually impossible" to locate specific documents as a result of a telephone call. Moreover, he said that customs brokers' files are by number of document, not by name of the consignee, so that to find the documents he actually did produce for the Government after a specific request, handling as he did about 1,000 transactions per month, he had to search some 24,000 separate items individually. At the very least what I think we should be talking about is whether there was a reasonable probability that the Government would have uncovered the Falleys' shipments through its customs house telephone calls, not just a remote or perhaps hypothetical possibility that this would occur. *See* United States v. Paroutian, 299 F.2d 486, 489 (2d Cir. 1962). United States v. Cole, 463 F.2d 163 (2d Cir.), cert. denied, 409 U.S. 942, 93 S.Ct. 238, 34 L.Ed.2d 193 (1972), is not to the contrary; indeed there the court specifically said that it was not undermining the *Paroutian* rule, which it stated was

> not whether the government would have, in the normal course of events, discovered the evidence by independent legal sources, but whether in fact they did actually make the discovery from independent legal sources.

463 F.2d at 174. Here under *Paroutian* and *Cole* standards, my view is that there was taint.

The acceptance by the majority of the thin thread of evidence presented by the Government to show an "independent basis" for the discovery of appellants'

---

that he does not "own" his wife's passport and therefore is in no position to withhold it from the court.

*See* Fuller v. United States, 31 F.2d 747 (2d Cir.), cert. denied, 280 U.S. 556, 50 S. Ct. 17, 74 L.Ed. 612 (1929).

1. It is difficult to tell just what the Government means by this term. There appears to

be only one meaning, viz., that by obtaining some other information the "saturation" investigation was no longer necessary. That information could come from only one of two sources, however, the now lost address books or as the result of a slip of paper on which was written an airway bill number and which was also illegally seized and indeed suppressed by the trial court.

customs broker verges on adoption of a rule that would permit the Government to prevail in a "taint" hearing on the mere showing of a hypothetical independent source for the information obtained as the fruits of an illegal search or seizure. Only the other day, Mr. Justice White stated that "it is a significant constitutional question whether the 'independent source' exception to inadmissibility of fruits, Wong Sun [v. United States] . . . 371 U.S., at 487–488 [83 S.Ct. 407], encompasses a hypothetical as well as an actual independent source." Fitzpatrick v. New York, 414 U.S. 1050, 94 S.Ct. 554, 38 L. Ed.2d 338 (1973) (White, *J.*, dissenting from denial of cert., joined by Douglas, *J.*). In doing so he also pointed out that the Second Circuit in *Paroutian, supra,* had rejected the "inevitable discovery" rule—to the effect that proper police investigation would in any event have resulted in the obtaining of the information. It seems to me that the panel majority here is in effect overruling *Paroutian* sub silentio.

Accordingly, I respectfully dissent, and would reverse and remand on this ground also.

