**UNITED STATES of America ex rel. Daniel H. ROBERTS, Petitioner,**

v.

**Vito TERNULLO, Superintendent, Fishkill Correctional Facility, Beacon, New York, Respondent.**

**No. 75 C 758A.**

United States District Court, E. D. New York.

Jan. 7, 1976.

Kalman V. Gallop, New York City, for petitioner.

Louis J. Lefkowitz, Atty. Gen. of N. Y. by Lillian Z. Cohen, Asst. Atty. Gen., New York City, for respondent.

## MEMORANDUM AND ORDER

NEAHER, District Judge.

Petitioner, Daniel H. Roberts, a State prisoner, has applied for a writ of habeas corpus, 28 U.S.C. § 2241, *et seq.*, challenging the legality of his confinement on the claim that his conviction resulted from evidence obtained through illegal search and seizure.

Petitioner was convicted on July 23, 1973 of multiple counts of forgery and the making of an apparently sworn false statement, and one count of petit larceny, after a jury trial in the County Court of Nassau County. He was sentenced to concurrent terms ranging from definite terms of one year to an indeterminate term of four years and is presently serving that sentence at the Fishkill Correctional Facility, Beacon, New York. His conviction was affirmed by

the Appellate Division, *People v. Roberts*, 47 A.D.2d 664, 364 N.Y.S.2d 43 (2d Dep't 1975), after that court had remanded the case to the County Court for a hearing on the claim of tainted evidence raised here, 43 A.D.2d 947, 352 N.Y.S.2d 30 (2d Dep't 1974). Permission to appeal was denied by a judge of the Court of Appeals on March 2, 1975.

The precise nature of petitioner's constitutional claim and the pertinent State court rulings will more clearly appear from a preliminary statement of background facts which appear to be uncontradicted.

The record of State proceedings reveals that for some years prior to March 1972 petitioner had conducted through various corporations a retail fence business in Merrick, Nassau County. In 1966 certain of his business practices came under the scrutiny of the State Attorney General. That investigation indicated, through interview statements made by an employee and petitioner himself, that petitioner would frequently fail to deliver fencing contracted for by customers or deliver less than called for in the contract, and when full payment was not forthcoming, would file mechanics liens with the County Clerk in Nassau County against the customer's property. Such liens could not be lawfully filed for fencing not delivered unless the fencing had been made to order.[1] The liens filed by petitioner in the name of corporate entities he controlled met this requirement by falsely stating that fencing had been made to order when in fact it was a stock item.

In the fall of 1971, as the result of some 200 customer complaints, the Nassau County District Attorney undertook an investigation of Pasco Fence Sales, Inc., and related corporations owned by petitioner. That investigation focused upon the filing of mechanics liens by petitioner's corporations in the summer of 1971. In September 1971 the Attorney General supplied the District Attor-

---

1. See New York Lien Law § 3, McKinney's Consolidated Laws.

ney with information obtained from the 1966 investigation. In November 1971 the District Attorney obtained from the New York Secretary of State certified copies of the certificates of incorporation of some 25 fencing firms apparently controlled by petitioner and doing business in Nassau County. This included three corporations involved in the indictment eventually returned against petitioner.

In December 1971 the District Attorney received specific information from a Mrs. Roman Hanisch, who complained of unsatisfactory dealings with Pasco Fence. She related that after contracting for fencing and making a $50 deposit, she had received nothing, was refused the return of her deposit, and a mechanics lien was filed against her property by the petitioner's corporation, Fencecraft Industries of America, Inc. On December 7, 1971 the District Attorney obtained a certified copy of this mechanics lien from the Nassau County Clerk's office. The Hanisch transaction formed the basis of six counts in the indictment returned against petitioner.

On May 9, 1972 the Attorney General furnished the District Attorney with a list of mechanics liens filed by petitioner's corporations which were known to the Attorney General. Included in this list was a mechanics lien filed against the premises of a Mr. Charles Mancini, which formed the basis of four counts of the indictment returned against petitioner. Prior to the receipt of that list, the District Attorney had already interviewed one Allen Joseph Burke, an employee of petitioner, who testified that as part of his duties he notarized mechanics liens for the various fencing corporations operated by petitioner.

On May 2 and 5, 1972 there occurred the events which have given rise to this petition challenging the validity of petitioner's conviction. They must be viewed in the light of a transaction on March 22, 1972 by which petitioner sold his fence business, inventory and equipment to an independent concern, Anco Fence, Inc., whose president was one Stanley Lynn. As part of the transaction, petitioner, as president of Pasco Realty Corp., leased substantially all of his former place of business to Anco for a 10-year term, retaining for petitioner's use only a two-room office on the first floor of the building. Business records of petitioner's corporations, however, remained in filing cabinets (which were sold to Anco) in the portion of the premises leased to Anco. Under the contract of sale, petitioner was obligated to "remove within a reasonable time, all business records, except lists of suppliers and lists of customers, and information as to prices with respect to both suppliers and customers." Between March 22 and April 10, 1972, defendant removed some of his records but failed to remove the balance although repeatedly requested to do so by Lynn. On April 22, 1972 Lynn had the locks changed on the leased premises, thereby cutting off petitioner's access to the unremoved records.

Returning to the date of May 2, 1972, on that day a Nassau County detective and investigators from the District Attorney's office visited the Anco premises, apparently at the invitation of Lynn, who had been served the day before with a District Attorney's subpoena *duces tecum*. The subpoena directed Lynn to appear on May 5, 1972 before a grand jury investigating petitioner. It also ordered him to produce "All customer lists, books and records, correspondence, memoranda, and retained copies of all legal documents . . . pertaining to Pasco Fence, and any corporation or individuals using the name Pasco Fence." Lynn permitted the investigators to examine such records as were still in filing cabinets on the Anco premises and those selected by them were produced by Lynn before the grand jury on May 5, 1972 and were later left in the District Attorney's custody.

On October 13, 1972, the grand jury returned a 34-count indictment against petitioner, charging him with multiple counts of forgery, possession of forged instruments, making an apparently sworn false statement, perjury, offering a false instrument for filing, and petit

larceny. These counts were all based on seven mechanics liens filed by petitioner's corporations.[2] Two of these were the Hanisch and Mancini liens previously referred to. The remaining five mechanics liens mentioned in the indictment had been identified from copies included in the business records turned over by Lynn.

Prior to trial, petitioner moved to suppress evidence obtained as a result of the May 2nd subpoena and to dismiss the indictment. County Judge Morrison, after an evidentiary hearing, granted petitioner's motion to suppress, finding that petitioner had not abandoned or relinquished control or ownership over the files which were seized, that the subpoena was not directed to the lawful owner, and that Lynn could not give a legal consent to the search. Included among the suppressed items were petitioner's copies of the seven mechanics liens upon which the charges in the indictment were based. Judge Morrison, however, denied petitioner's motion to dismiss the indictment.[3]

Despite the suppression ruling, Judge Morrison permitted the prosecution to introduce into evidence at trial, over objection, certified copies of seven mechanics liens obtained from the County Clerk's office on May 15, 1972. These were authenticated facsimiles of the originals on file in that office, copies of which had been retained by petitioner in the records turned over by Lynn under the District Attorney's subpoena. The certified copies of the originals were admitted into evidence pursuant to New York CPLR § 4540, which makes such a copy of a public record prima facie evidence thereof, thus eliminating the need for the testimony of the public official having custody of them. Petitioner was found guilty on 16 of the 34 counts in the indictment. These included seven counts of forgery in the second degree

and seven counts of making an apparently sworn false statement in the first degree, each series of counts being based upon the same seven certified copies of mechanics liens previously mentioned, n. 2 *supra*.

On petitioner's appeal from his conviction, the Appellate Division held the appeal in abeyance and remanded the case to the County Court for a hearing

"at which the People would be required to establish that the copies being used had not been come at by exploitation of the illegally seized evidence or by means sufficiently distinguishable to be purged of the primary taint. (*Alderman v. United States*, 394 U.S. 165, 89 S.Ct. 961, 22 L.Ed.2d 176)."

*People v. Roberts*, 43 A.D.2d 947, 352 N.Y.S.2d 30 (2d Dep't 1974). The Appellate Division also noted that "absent a showing that there was an independent source, the ones used [*i. e.*, certified copies] would be considered fruit of the poisoned tree" [citations omitted]. 352 N.Y. S.2d at 31.

As directed, Judge Morrison held an evidentiary hearing on May 9, 1974. That hearing brought out in detail the facts heretofore mentioned concerning the antecedent and independent investigations of the Attorney General and the District Attorney and the independently obtained information concerning the Hanisch and Mancini liens, which were two of the seven mechanics liens underlying petitioner's conviction. The hearing also brought forth a concession by the prosecution that the District Attorney's first specific knowledge of the five remaining mechanics liens came from petitioner's records obtained under the subpoena to Lynn. Nevertheless, Judge Morrison found that

"the evidence establishes that even before the seizure, the District Attorney possessed all the necessary data to ob-

---

**2.** Appellate Division Record on Appeal (hereinafter "Record"), Vol. 1, pp. 5a–6a, 10a–11a, 15a–16a, 20a–21a, 25a–26a, 30a–31a, and 35a–36a.

**3.** Record, Vol. 1, p. 75.

tain the mechanics liens from the County Clerk without resorting to any illegality. The defendant's assertion that discovery was not inevitable rests upon the District Attorney's supposed ignorance of the County Clerk's filing procedures. Whether he did or did not know of the filing procedures is relatively unimportant. The information developed during the investigation prior to any illegality pointed toward mechanics liens, and common sense dictated that inquiries eventually be made of the County Clerk. We are loath to presume that District Attorneys lack common sense."

"Moreover, the intrusion upon protected rights in this case was as minimal as possible given the fact that it was improper. The documents were taken without objection from a person in actual custody and possession, and with apparent but not actual authority to surrender them. There is no evidence of any conscious purpose on the part of the People's agents to evade constitutional restraints upon their activities. . . . The facts before this Court are sufficiently clear and numerous to warrant the finding that the evidence admitted at the trial was evidence that would have come to light with the application of even ordinary investigative diligence." [4]

Judge Morrison therefore concluded "that the certified copies of the mechanics liens introduced into evidence at trial were not the fruit of the poisonous tree, and were not subject to suppression on the trial."

On the return of the case to the Appellate Division, that court on February 18, 1975 unanimously affirmed petitioner's conviction. The court's memorandum opinion setting forth its reasons for that decision makes clear that the case was not regarded as coming within either the "independent source" exception mentioned in Silverthorne Lumber Co. v. United States, 251 U.S. 385, 40 S.Ct. 182,

64 L.Ed. 319 (1920), or the "attenuation" exception noted in Wong Sun v. United States, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963). Rather, as the Appellate Division put it,

"This case falls within the purview of the doctrine of inevitable discovery, that is, evidence derived from information obtained in an unlawful search is not inadmissible under the fruit of the poisonous tree theory where it is shown that such evidence inevitably would have been gained without the unlawful action (People v. Fitzpatrick, 32 N.Y.2d 499, 506, 346 N.Y.S.2d 793, 300 N.E.2d 139, cert. den. 414 U.S. 1033, 94 S.Ct. 462, 38 L.Ed.2d 324 [other citations omitted])."

47 A.D.2d 664, 364 N.Y.S.2d 43, 44–45 (2d Dep't 1975). The court therefore concluded:

"Upon the evidence adduced at the hearing we believe that the continued investigative work by the District Attorney's office would have led to a discovery of the notices of mechanic's liens at the County Clerk's office and the procurement of the certified copies thereof. It may not be fairly said that the District Attorney exploited the illegality involved in the prior seizure." Id.

In asking this court to overturn his conviction, petitioner primarily contends that the doctrine of "inevitable discovery" applied by the State courts has been rejected in this Circuit as a basis for relaxing the exclusionary rule barring the use of tainted evidence. Cited for that proposition are United States v. Paroutian, 299 F.2d 486, 489 (2 Cir. 1962), and United States v. Schipani, 289 F.Supp. 43 (E.D.N.Y.1968), aff'd, 414 F.2d 1262 (2 Cir. 1969), cert. denied, 397 U.S. 922, 90 S.Ct. 902, 25 L.Ed.2d 102 (1970).

In Paroutian, federal narcotics agents had searched the defendant's apartment without a warrant, where their attention was called to a new cedar lining in a

4. Decision on remand, Exh. 5 to Petition, at p. 9.

closet, which they unsuccessfully tried to remove. Two months later, after the defendant had been evicted, the agents again entered the apartment and this time found in the cedar closet a secret compartment containing heroin and a letter, which formed the basis for the defendant's arrest and prosecution. A motion to suppress that evidence as unlawfully seized was denied. On appeal, however, a majority of the court reversed the conviction, rejecting the government's argument that even though the initial search which aroused the agents' interest in the closet was illegal, a lead received from Interpol would have enabled them to find the secret compartment anyway. The majority opinion held that

> "a showing that the government had sufficient independent information available so that in the normal course of events it might have discovered the questioned evidence without an illegal search cannot excuse the illegality or cure tainted matter. . . . The test must be one of actualities, not possibilities." 299 F.2d at 489.

Although the foregoing language appears quite apposite to the situation here, it is by no means certain that a rule was being declared which precluded the inevitable discovery limitation under any and all circumstances. Indeed, as the Attorney General points out, a more recent Second Circuit case, *United States v. Falley*, 489 F.2d 33 (2 Cir. 1973), rejected an argument that a drug conspiracy conviction should be upset because part of the evidence stemmed from an address book obtained through a concededly illegal search of a defendant's home. In reaching that decision, the majority opinion, written by Judge Moore (who dissented in *Paroutian* ), noted:

> "The investigating agents suspected that the narcotics were being imported from India. Such importations would logically be handled by customs bro-

kers at the port of entry. It would have been only a question of time before the government by a so-called saturation investigation, or otherwise, would have discovered the broker and the importation documents. Even if the address book had shortened or facilitated the investigation, it did not supply fruit sufficiently poisonous to be fatal." 489 F.2d at 40; footnote omitted.[5]

The facts in *Falley, supra,* more closely resemble those found in this case than those presented in *Paroutian, supra.* The facts here, moreover, are even less speculative by comparison with those in *Falley.* There, the government agents were faced with investigating 98 customs brokers, of whom less than 10 had been contacted when the address book was seized. In addition, since the importation documents were filed by number and not by consignee, a broker would have "had to search some 24,000 separate items individually" in order to find those affecting the defendants. 489 F.2d at 42 (Oakes, C. J., dissenting). Here, the County Clerk's office was the only place the investigators could go to find mechanics liens filed by petitioner. Moreover, since they knew the names of petitioner's various corporations and had the names of over 200 complainants, they could have searched through a year's records in an hour.

Furthermore, unlike *Paroutian* or *Falley, supra,* the hearing ordered by the Appellate Division produced the following findings:

> "the intrusion upon protected rights in this case was as minimal as possible given the fact that it was improper. The documents were taken without objection from a person in actual custody and possession, and with apparent but not actual authority to surrender them. There is no evidence of any conscious purpose on the part of the

---

5. Although the *Falley* defendants' convictions were reversed, the reversal was for other reasons which required a new trial as to them. The conviction of other defendants was affirmed.

People's agents to evade constitutional restraints upon their activities." [6]

Moreover, in a federal prosecution a search such as that which brought petitioner's records to the attention of the District Attorney would not have been deemed in violation of Fourth Amendment rights. The State court record is clear that Lynn, as president of Anco, the occupant of the premises, showed the District Attorney's investigators the cabinets, then owned by Anco, wherein petitioner's records were kept. The rule is well settled that "[c]onsent to a search by one with access to the area searched, and either common authority over it, a substantial interest in it or permission to exercise that access, express or implied, alone validates the search." *United States v. Gradowski*, 502 F.2d 563 (2 Cir. 1974), citing as authority *United States v. Matlock*, 415 U.S. 164, 170–71, 94 S.Ct. 988, 39 L.Ed.2d 242 (1974), and *United States v. Gargiso*, 456 F.2d 584, 587 (2 Cir. 1972).

The inspection of records of petitioner's corporations under such circumstances can hardly be viewed as an unreasonable intrusion upon his privacy in violation of the Fourth Amendment. Indeed, the only impropriety that can be detected was the District Attorney's use of a subpoena directed to Lynn rather than to petitioner to produce these records before the grand jury. Had the subpoena been served on petitioner as an officer of the corporations, he would have had to comply, even though he himself might have been incriminated by their production. *Bellis v. United States*, 417 U.S. 85, 94 S.Ct. 2179, 40 L.Ed.2d 678 (1974). As *Bellis* points out, a "long line of cases has established that an individual cannot rely upon the privilege [Fifth Amendment] to avoid producing the records of a collective entity

which are in his possession in a representative capacity, even if these records might incriminate him personally." *Id.* 94 S.Ct. at 2183.

If ever there was a case in which the New York rule of "inevitable discovery" ought not to be viewed as an unconstitutional exception to the exclusionary rule, this is it. We are not confronted here with any claim of a "hypothetical" independent source. The public lien records of Nassau County are an existing fact. The copies of the mechanics liens which were held to have been unlawfully seized by subpoena were not legally admissible evidence of defendant's criminal acts. They were acceptable for grand jury purposes but for nothing else. See *United States v. Calandra*, 414 U.S. 338, 349, 94 S.Ct. 613, 620, 38 L.Ed.2d 561 (1974). The true evidence of petitioner's criminal acts were the originals, which he himself caused to be placed on public record. Thus it is impossible to find here that publicly recorded liens might have remained hidden from disclosure but for the wrongful seizure of the copies found in petitioner's files or that any right of privacy was invaded by their use.

Assuming, *arguendo*, that the *Paroutian* test, *supra*, is the correct constitutional standard, it cannot be said here that the *fact* of petitioner's filing of fraudulent liens was "actually discovered by a process initiated by the unlawful act." 299 F.2d at 489. The independent discovery of the Hanisch and Mancini liens in the prior investigations of the Attorney General and the District Attorney removes any doubt about this. At best, the seized copies simply identified additional victims of a fraud already spread upon the public record and the subject of investigation.[7] To deprive the State in such circumstances of the evi-

---

**6.** Decision on remand, Exh. 5 to Petition, at pp. 9–10.

**7.** Petitioner's secondary argument that the seized copies prompted the District Attorney to intensify his investigation, cf. *United States*

*v. Schipani, supra*, pp. 1176–1177, is thus without merit. Moreover, there is reason to question whether the broad statement quoted from the *Schipani* opinion in this court, Petitioner's Memorandum of Law at p. 7, represents the prevailing view in this Circuit. See *United*

dence in its own public records would neither advance the constitutional purposes of the exclusionary rule nor serve the ends of justice.

The petition is dismissed.[8]

So ordered.

*States v. Friedland,* 441 F.2d 855, at 859 (2 Cir. 1971), and *United States v. Cole,* 463 F.2d 163, at 172 (2 Cir. 1972). The prosecution in this case more than met any burden of showing that its investigation would have continued without the information contained in the subpoenaed copies of liens.

8. In view of this disposition it is unnecessary to consider the Attorney General's argument that petitioner failed to exhaust available State remedies. Respondent's Memorandum of Law at pp. 2–5.